**In re 604 COLUMBUS AVENUE
REALTY TRUST, Debtor.**

**604 COLUMBUS AVENUE REALTY
TRUST, Millicent C. Young, and
the Young Family Trust, Plaintiffs,**

**v.**

**CAPITOL BANK AND TRUST
COMPANY, Defendant.**

**Bankruptcy No. 88–10117–CJK.
Adv. No. 88–1172–CJK.**

United States Bankruptcy Court,
D. Massachusetts.

Sept. 28, 1990.

John F. Cullen, Boston, Mass., for plaintiffs.

Kevin F. Moloney, Boston, Mass., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CAROL J. KENNER, Bankruptcy Judge.

This adversary proceeding arises out of a financing agreement between plaintiff (and debtor in this Chapter 11 bankruptcy case) 604 Columbus Avenue Realty Trust ("the Debtor") and defendant Capitol Bank and Trust Company ("Capitol Bank" or "the Bank"). The Bank loaned the Debtor $1.5 million to purchase real property located at 604–610 Columbus Avenue in Boston, Massachusetts, and the restaurant, Bob the Chef, operated at that location, and to renovate and resell part of the real property as condominiums. To secure the loan, the Bank obtained guarantees from plaintiff Millicent C. Young ("Young"), who holds 62.5 percent of the beneficial interest in the Debtor trust, and from the third plaintiff, the Young Family Trust, of which Young is the sole beneficiary. The Bank also obtained mortgages on the following Boston properties: (1) the Debtor's real property at 604–610 Columbus Avenue; (2) the Young Family Trust's real property at 227 Roxbury Street; (3) Young's real property at 9–15 Ruggles Street; (4) and Young's real property and residence at 56 Patten Street. The Debtor was unable to complete the renovation and repay the loan when it matured and was forced to refinance it and then to seek a further extension of the loan. When the Debtor still could not repay, the Bank commenced foreclosure proceedings. The Debtor filed its petition under Chapter 11 of the Bankruptcy Code before the Bank's scheduled foreclosure sale. Millicent Young has also filed a Chapter 11 petition in this Court.

In this adversary proceeding, the plaintiffs allege that the Bank entered into and administered this loan for the improper purpose of extracting a kickback from the Debtor's loan proceeds and with the knowledge and intention that this loan would lead to refinancing and ultimately to foreclosure. They also allege that the Bank improperly applied large amounts of loan proceeds to the payment of financing fees, interest, and other "soft costs" related to the loan. On the basis of these and related allegations, they assert nine counts against the Bank: counts for fraud, deceit, criminal consideration, conversion, equitable subordination, lender liability, unjust enrichment, breach of fiduciary duty, and breach of contract. And on the basis of these counts, they seek relief in three forms: first, an order avoiding the Bank's mortgages on

their properties; second, an order under 11 U.S.C. § 510(c) subordinating the Bank's claim in the Chapter 11 bankruptcy case of 604 Columbus Avenue Realty Trust to the claims of the unsecured creditors therein; and third, damages of $1,750,000 with interest.

The Court finds for the plaintiffs on their counts for conversion, fraud and deceit, breach of contract, and equitable subordination. On the basis of the following findings of fact and conclusions of law, the Court concludes that judgment for damages should enter for the Debtor in the amount of $138,011.66, plus interest thereon at the contract rate (not less than 12.5 percent per annum) and attorney's fees. The Court further concludes that Capitol Bank's claim against the Debtor's bankruptcy estate should be subordinated to claims of priority and general unsecured claimants in an amount equal to the full amount of damages itemized in the preceding sentence; and that the Bank's security interest in estate property should be transferred to the estate to the extent of value therein equalling the amount of total damages. With respect to all other counts and requests for relief, judgment should enter for the Bank.

*Findings of Fact*

The Court enters the following findings of fact.[1]

Negotiations to Purchase 604–610 Columbus Avenue

1. In the fall of 1985, Millicent Young was a contractor and the owner of Ebony Construction Company, a contracting company she formed during the 1970s. Ebony specialized in carpentry and the installation of drywall and insulation. Young also owned real property in Boston, including the property at 56 Patten Street, where she resided, and the property (four parcels) at 9–15 Ruggles Street, which she was trying to develop. She was also the sole beneficiary of the Young Family Trust, a nominee realty trust that owned the real property at 227 Roxbury Street in Boston. Hilda Fleming was its trustee.

2. Around the same time, Young became friendly with Carl Benjamin ("Benjamin") and began to rely on him as a financial adviser and assistant. She trusted him and had faith in his judgment. (Tr. 3:111–112)[2] He was helping her obtain money to finance the development of her Ruggles Street property. (Tr. 2:36–37, 40)

3. In October, 1985, Young and Benjamin learned that the two buildings located at 604–610 Columbus Avenue, Boston, were for sale, as was the restaurant operated there, known as Bob the Chef. At the time, Young and Benjamin were looking for properties to develop. They became interested in the Columbus Avenue property as an investment and because the restaurant was a landmark. (Tr. 2:38)

4. Young, Benjamin, and Melvin Averett and Frank Barrows entered into a business relationship among themselves through which they would purchase the Columbus Avenue properties, renovate and resell the properties as condominiums, resell the restaurant, and share the profits from the condominium sales and restau-

---

**1.** During the trial, in an effort to shorten the trial and to contain the considerable hostility between the parties, the Court did not permit counsel to state and argue the bases for their evidentiary objections except when the Court specifically indicated otherwise. After the trial, the Court afforded counsel an opportunity to state in writing the bases of those of their objections that the Court had overruled without their having been afforded an opportunity to state the bases. In the light of these written statements, the Court reconsidered each of the rulings addressed therein. The Court's rulings on these and other evidentiary matters, set forth in its "Memorandum of Decision and Order" of February 14, 1990, are incorporated herein by reference.

Also, the Court notes at the outset that it attributes no evidentiary value to, and makes no finding of fact on the basis of, the refusal by witnesses Carl Benjamin, Melvin Averett, Richard Jaffe, and Sidney Weiner to answer questions on the ground that their answers would tend to incriminate them. Nor does the Court attach significance to Sherwood Tarlow's failure to appear after having been subpoenaed to testify at trial.

**2.** The citations herein to the transcript and to exhibits are not meant to be exhaustive statements of the evidentiary bases of each finding.

rant. They agreed that Young would own 62.5 percent of the equity in the property and that Benjamin, Averett, and Barrows would each own 12.5 percent. They agreed that Young would contribute money and the property to be used as collateral to make the purchase, and that her company would do the development work. No one else would contribute money or property. Benjamin was to contribute his financial expertise: submit the loan application, handle the paperwork, and obtain financing for the project. Frank Barrows, a plumber, would be responsible for the plumbing part of the project. And Melvin Averett, who owned an industrial plumbing shop, would contribute all the plumbing materials through his shop. (Tr. 2:41–48)

5. In November, 1985, Young and Benjamin met with Robert Morgan, who owned Bob the Chef, Inc. and the Columbus Avenue properties[3], and offered to purchase the restaurant and both properties from him for a total of $1.2 million. Morgan accepted the offer. They entered into a purchase and sale agreement on December 10, 1985. (Exhibit 3)

6. In October, 1985, Young and Benjamin asked attorney Stephen Kunian (of the law firm then known as Singer, Stoneman, Kunian and Kurland), who was already representing Young with respect to another matter, to represent them and Averett and Barrows with respect to the purchase of the Columbus Avenue properties. Kunian agreed to represent them and recommended that they apply for financing at Coolidge Bank and Trust, Guaranty First Trust Company, and Capitol Bank and Trust Company. He contacted each of these institutions to ask whether they were interested in financing the Columbus Avenue purchase and renovations. (Tr. 6:161–164; Exhibits 120, 121 and 154) In particular, he called Howard Tarlow at Capitol Bank and Trust Company, and on November 15, 1985, sent a letter (Exhibit 121) and loan proposal to him. After receiving the proposal, Tarlow informed Kunian that Capitol Bank would like to pursue the pro-

posal further. Kunian so informed his clients, who then went to Capitol to negotiate the loan. Kunian did not participate in the negotiation of the monetary terms of the loan. (Tr. 6:164; 7:77–78).

7. Kunian's firm represented the Bank from time to time on loan transactions. (Tr. 6:132, 164–165) Kunian himself had represented the Bank for perhaps seven years by the fall of 1985. (Tr. 7:98) Kunian would give business to the Bank by sending his clients there with their loan proposals. Usually, when the client did get a loan from one of the banks he represented, including Capitol Bank, Kunian would represent both the bank and the clients at the closing. He had done that on a number of occasions. Capitol Bank was amenable to such joint representation arrangements with Kunian. (Tr. 6:152–153; Tr. 7:66–68, 71, 77–78, 98–99)

8. When Kunian, Young, and Benjamin first approached Capitol Bank with their loan proposal, Benjamin knew and had worked with Richard Jaffe, a mortgage broker who placed loans with Capitol Bank. The person Jaffe knew at Capitol Bank was Sidney Weiner. (Tr. 7:87; Tr. 1:95, 162–163) Benjamin and Jaffe had earlier worked together in brokering at least one loan, a $62,000 loan obtained by Millicent Young from Seacoast Mortgage Company in Rhode Island. At the closing on that loan, Benjamin and Jaffe had received a $3,000 brokerage fee from its proceeds. It was in connection with the Seacoast loan that Young first met Benjamin and Jaffe. (Tr. 2:24–34)

Negotiations with Gauthier, Weiner, and Executive Committee

9. Around the time when Young and Benjamin brought their loan proposal to Capitol Bank, the Bank normally received and processed loan applications as follows. The borrower would meet with a loan officer and be required to submit a loan application form like the one introduced into evidence as Exhibit 87. It would not be

---

3. Morgan did not own the Columbus Avenue properties himself. Rather, it appears that he held interests in two entities, the REO Bar Realty Trust and Boston Condominium Co., Inc., which themselves owned the properties.

necessary to complete the form in detail; rather, it would be sufficient if the form were signed by the borrower and identified the borrower and the amount of the loan. The relevant financial information needed to support the application, if not provided on the application form, could be provided separately. The borrower and loan officer would then discuss and negotiate the loan, but the loan officer could not approve loans in excess of $25,000 for the Bank. The loan officer would prepare a loan proposal and present it to the Executive Committee (of the Bank's Board of Directors), which would have ultimate authority to approve or reject the proposal. Occasionally, the Committee would neither approve nor reject the loan, but simply "table it," that is, do nothing. When the Committee approved a loan, the loan officer would draft and send the borrower a commitment letter such as the one introduced into evidence as Exhibit 8. The loan officer would also retain an attorney to draft the relevant loan documents and to conduct the closing on behalf of the Bank.

10. After Kunian put Benjamin and Young in touch with Capitol Bank, Benjamin took charge (on behalf of himself, Young, Barrows and Averett) of applying for the loan at Capitol Bank and negotiating its terms. Young did not participate in the actual negotiations except to the extent that she verified some of the information Benjamin gave to the Bank. The Bank was represented in the negotiations by Arthur Gauthier, an experienced loan officer who concentrated almost exclusively in commercial real estate transactions. Gauthier was also Senior Vice President of the Bank; he was subordinate only to the Bank's president, executive vice president and treasurer. His duties as a loan officer were to meet with clients, discuss their loan requests, make presentations to the Executive Committee, see loans through to closing, and administer them until they were paid off.

11. Sidney Weiner also participated in the negotiations. (Tr. 3:113–115; Tr. 4:98–99) Sidney Weiner was a member of the Bank's Board of Directors and of the Board's Executive Committee and was also a consultant to the Bank. He did not receive a salary but did receive director's and consultant's fees. He also owned five percent of the stock of the Bank's holding company. During the years relevant to this proceeding, his consultant's fees were in the $60,000 to $80,000 range. As a consultant, he reviewed loan files (he was the only member of the Board who did this) and Bank finances and projects and did appraisals for the Bank. He was also required under his consulting contract to oversee or monitor construction loans. (Tr. 4:29) As a consultant, he would not normally be assigned to a specific loan, deal directly with borrowers, or become involved in the day-to-day administration of loans, as loan officers did. Rather, loan officers would bring loan problems to him as they arose. (Tr. 4:14, 30–33) Sometimes the Bank's president, Sherwood Tarlow, would ask Weiner to get involved with the loan. (Tr. 4:85–88) When Weiner did become involved in the administration of a loan, Bank loan officers and employees, including the Bank's Senior Vice President, Arthur Gauthier, felt Weiner was in charge and would follow his orders. Gauthier believed Weiner was in charge of the Trust's loan.

Weiner participated in the negotiation of the 604–610 Columbus Avenue loan by communicating directly with Benjamin about the status of the loan, whether it would be approved or denied. (Tr. 2:63–65) Through an intermediary, Richard Jaffe, Weiner also communicated with Young. Jaffe called Young one morning in December, 1985, after the Executive Committee had denied the then-pending loan proposal, and told her that Weiner had said to put up 227 Roxbury Street as collateral. (Tr. 3:113–115)

12. Gauthier presented the proposal for the 604–610 Columbus Avenue loan to the Executive Committee three times before the Committee approved it: first on December 4, 1985, when the Committee "tabled" the proposal and sent it to be reworked (Tr. 4:96–97; Tr. 7:140–141; Exhibits 1 and 4); a second time on December 11, 1985, when the Committee denied the proposal (Tr.

4:99; Exhibits 2 and 5); and again, after further changes had been made, on January 15, 1986, when the Committee finally approved it. (Tr. 4:104–105; Exhibit 6) Between presentations, Gauthier conducted additional negotiations with Benjamin and Young to see whether the proposal could be modified to meet the Committee's concerns. (Tr. 4:98–99, 106–107)

13. The Executive Committee was comprised of six or seven members of the Bank's Board of Directors. (Tr. 4:66) It required a quorum of three members to act as a committee on a loan proposal. (Tr. 4:66) All members' votes were of equal weight. (Tr. 4:67 and 7:133). Sherwood Tarlow, who was then president of the Bank, acted as the Committee's chairman (Tr. 7:133) but was not a member of the Committee. (Tr. 5:72)

14. John P. Meehan, a director of the Bank and member of the Executive Committee, attended at least two of the three meetings at which Gauthier presented Benjamin's loan proposal to the Committee. He voted to approve the loan after changes were made in the proposal. (Tr. 7:140) Sidney Weiner, another member of the Executive Committee, attended at least the first and third meetings. (Tr. 4:70–71; Tr. 5:72) At the first, he said he felt the proposal lacked sufficient collateral and opposed the loan. (Tr. 4:70–71) The record contains no evidence of whether Weiner attended the December 11 meeting. He voted to approve the loan at the January 15 meeting, at which the Committee approved the loan. The members present on January 15 were Meehan, Weiner, and Charles Gulino. (Exhibit 144; Tr. 5:71–72) Various loan officers and Sherwood Tarlow, all of whom were not members, were also present. (Tr. 5:71–72) The Court has no evidence as to how Gulino voted on January 15. And except with respect to the facts discussed in this paragraph, the Court has no evidence as to which members of the Committee attended each of the three meetings and how each member in attendance voted.

15. When the Executive Committee approved the loan, it believed that the total present value of the properties that would secure the loan was $3,000,000 and that these properties were subject to encumbrances totalling only $380,000. The Committee also believed that when construction on these properties was completed, their total value would be $3,920,000.00. (Exhibit 87, page 4)

16. The evidence with respect to the Committee's deliberations and motivations is limited. At the first meeting, the Committee discussed the borrower's ability to perform the proposed construction, the marketability and selling prices of the condominiums to be developed, and the sufficiency of the collateral. (Tr. 4:70–71; Tr. 5:67–68) The Committee was very concerned with the sufficiency of the collateral. This concern was why the loan required three presentations to gain the Committee's approval; each time the Committee wanted more collateral. The Committee specifically wanted Young to put up her residence at 56 Patten Street, Boston, as collateral, which she did on the third proposal. (Tr. 5:68) Her contribution of the Patten Street property was a major factor in finally obtaining the Committee's approval. (Tr. 4:109) Another factor that influenced the Committee to approve the loan was the fact that Young, a black woman, was a minority applicant developing property in a minority neighborhood. At the time, the Bank was under pressure in the form of negative publicity and protest demonstrations to do more lending in Boston's minority neighborhoods. The Committee was pleased to have a minority applicant with good credentials. (Tr. 5:68) The evidence does not support plaintiffs' allegation that the Bank or its Executive Committee approved the loan to the Debtor with the knowledge that the Debtor would default on it and with the intention of foreclosing on the collateral.

The Kickback Agreement

17. At some time before the Executive Committee approved the loan, Weiner told Benjamin that the loan would be approved only on the condition that Benjamin agree to pay Weiner himself (not the Bank) money for approving the loan or at least for

allowing it to be approved. Witnesses Jack Finer, James Dilday, and Millicent Young testified to various out-of-court statements made by Carl Benjamin[4] about his kick-back agreement with Weiner. The Court finds that Benjamin made the statements that these witnesses reported he made, and that his statements are credible. They are credible not only because they are statements against interest, but because the statements he is reported to have made to Finer and to Averett are consistent with each other, and because Benjamin's statements are corroborated in part by other evidence in the record.[5] Benjamin's statements together show that he agreed to pay Sidney Weiner money in order to obtain approval of the loan.

18. Weiner had substantial influence on the decisions of the Executive Committee. The Committee members looked to him for direction as to how they should vote regarding the approval or disapproval of a loan. (Tr. 5:157–158)

19. Weiner was generally able to influence or control the Executive Committee's ultimate decision to approve the loan to the Debtor Trust in three ways. First, Weiner had sufficient authority within the Bank to control whether a loan proposal would ever get to the Executive Committee for consideration. Second, Weiner was a voting member of the Committee and could exert some control over the loan's fate by casting his vote for or against it. Third, Weiner could influence the fate of the loan through his influence on other members of the Committee.

20. Because of his kickback agreement with Benjamin, Weiner allowed the Trust's loan proposal to reach the Executive Committee, voted to approve the loan, and influenced other members of the Committee to approve the loan.

21. The Court has no evidence that the subject of kickbacks—payments by the borrower to officers, directors, employees, or agents of the Bank in exchange for or in connection with approval of the loan—was discussed at any of these Executive Committee meetings. There is no evidence that the prospect of obtaining a kickback from the Debtor directly influenced the vote of any of the Committee members except Weiner.[6]

The Closing

22. Just after the Executive Committee approved the Debtor's loan proposal on January 15, 1986, the Bank engaged Kunian to represent the Bank at the closing on the Debtor's loan. (Tr. 5:47–48; Tr. 7:78–79) From January 15, 1986, until the closing was completed, Kunian represented for purposes of the closing and loan transaction not only Young, Benjamin, Averett, Barrows, and the Trust they would form (the Debtor), but also the Bank. (Tr. 6:152)

23. On January 22, 1986, Gauthier drafted and issued a commitment letter (Exhibit 8) on behalf of the Bank, setting forth the terms of the loan as approved. (Tr. 4:124–125) He sent the letter to Kunian, and Young received a copy as well. (Tr. 6:152; Tr. 7:88)

24. The closing occurred on February 27, 1986, in Sherwood Tarlow's office at the Bulfinch Place office of Capitol Bank in Boston. In attendance were Millicent Young, Carl Benjamin, Frank Barrows, Stephen Kunian, Robert Morgan, Joseph Brodigan (the sellers' attorney) and Arthur

---

4. Dilday's testimony appears at Tr. 1:205–208; Finer's appears at Tr. 1:108–110, 120–121, and 124–129; and Young's appears at Tr. 3:27–31.

5. Perhaps the most significant corroborative evidence is Weiner's unusual and unexplained interest in and involvement in the oversight of this loan. The loan officer in charge of this loan, Arthur Gauthier, was experienced and quite capable of handling this loan on his own; yet Weiner became directly involved in the loan, even in the negotiation stage, long before any problems arose with it. Also, Weiner used Jaffe to communicate with Young about the loan, and

he authorized disbursements of proceeds that violated the loan agreements and normal protocol. Weiner, on occasion, authorized advances which Gauthier had declined to make. See ¶ 96, below.

6. The Court's findings are arranged chronologically, so the findings relating to the kickback and its execution are somewhat dispersed. Kickback-related findings continue in paragraphs 60 through 71; see also paragraphs 40, 41, 44, 45, 91, 94, 97, and 105.

Gauthier. (Tr. 2:78; Tr. 6:158) I have no testimony that Melvin Averett attended the closing, but from the fact that his signature appears on several documents executed at the closing—the Certificate of Beneficial Interest, the "Authorization and Direction," and one of the signature cards (Exhibits 10, 18, and A)—I conclude that either Averett attended the closing or he signed the documents before the closing.

25. Only at the closing did Young and Barrows learn that Kunian was also representing the Bank. (Tr. 2:76; Tr. 3:158) When she learned about this, Young asked Kunian how he could represent both sides. Kunian responded that it was okay. Believing Kunian, she did not object, and neither did Barrows. (Tr. 2:76; Tr. 3:158–159)

26. Kunian believed that the best manner for Young, Barrows, Averett, and Benjamin to hold the 604 Columbus Avenue real estate was through a realty trust. He advised his clients accordingly and created a realty trust for them, known as the 604 Columbus Avenue Realty Trust (the Debtor). (Tr. 6:159; Exhibit 9) The Trust was created at the closing. Millicent Young signed a "Declaration of Trust Establishing 604 Columbus Avenue Realty Trust" (Exhibit 9), which established the Trust and made her its trustee. In a separate document entitled "Certificate of Beneficial Interest" (Exhibit 10), signed by the Trust's four beneficiaries at the closing, the beneficiaries and their beneficial interests in the Trust were identified as follows: Millicent Young, 62.5%; Carl M. Benjamin, 12.5%; Melvin Averett, 12.5%; and Frank Barrows, 12.5%.

27. At the closing, Young, as Trustee of 604 Columbus Avenue Realty Trust, signed a Commercial Real Estate Promissory Note (Exhibit 11). In addition, Young, on behalf of the Trust, and Gauthier, on behalf of the Bank, signed a "Loan and Security Agreement" (Exhibit 13) and a "Construction Loan Agreement" (Exhibit 14). (Unless otherwise indicated, the promissory note and the two agreements will hereafter be referred to jointly as "the agreement.") The agreement contained the following provisions:

(a) The Bank agreed to lend the Trust $1,500,000 for six months at the Bank's prime rate plus three percent, but not less than twelve and one-half (12.5) percent. (Exhibit 11, p. 1)

(b) The Trust agreed to pay the Bank closing fees consisting of an origination fee of $45,000.00, a credit fee of $200.00, and an appraisal fee of $1,400.00; the Trust also agreed to pay the Bank $200.00 for each inspection the Bank made of the premises, with a minimum of two inspections. (Exhibit 13, addendum ¶ 8; Exhibit 14, page 12)

(c) The loan proceeds would be advanced for the following purposes: $1,200,000 at the closing to purchase the 604–610 Columbus Avenue property; $100,000 for the soft costs [7] of renovation, including the interest on the note and the fees itemized in the previous subparagraph; and $200,000 for construction costs on the premises. (Exhibit 13, addendum ¶ 11; Exhibit 14, ¶ 4)

(d) The construction costs would be advanced only upon receipt of itemized requisitions approved by the Trust, its architect, and the Bank; and advances would not exceed ninety percent (90%) of the value of the labor and materials incorporated in the improvements as of the dates of the requisitions. (Exhibit 14, pp. 11–12)

(e) The Trust agreed to pay the Bank, as additional consideration for the loan, an amount equal to three percent (3%) of the gross sales price of each of the condominium units to be sold. (Exhibit 13, addendum ¶ 9)

(f) The Trust could not sell any of the collateral for the loan without the Bank's prior written consent (Exhibit 13, ¶ 3.18 and addendum ¶ 1); the Bank agreed to execute partial releas-

---

**7.** "Soft costs" refers to the various non-construction costs of the renovation effort. It includes closing fees, interest, taxes, insurance, and other similar costs, but not expenditures for construction-related labor and materials.

es under the condominium mortgage subject to the condition (among others) that the entire proceeds from the sale of the individual units be applied against the balance due on the note. (Exhibit 13, ¶ 3.18 and addendum ¶¶ 1 and 15)

(g) The Trust agreed that any cash deposits credited by the Bank to the Trust would at all times be treated as collateral for the note and for any liabilities of the Trust to the Bank, and could be applied or set-off by the Bank against such liabilities at any time, whether or not such liabilities were then due. (Exhibit 11, page 2; Exhibit 13, § 6.01)

28. To secure the note, the Trust gave the Bank a mortgage on the Columbus Avenue parcels (Exhibit 26) and executed a conditional assignment of rents in favor of the Bank (Exhibit 22). Millicent Young in her individual capacity guaranteed the note (Exhibit 24) and gave the Bank a mortgage on her residence at 56 Patten Street, Boston, and another mortgage on her property at 9–15 Ruggles Street, Boston, to secure the note and her guaranty. (Second Amended Complaint, ¶ 27, and answer thereto; Exhibit 23)

29. I find no evidence to support plaintiffs' allegations (made in paragraphs 56 and 59 of the Second Amended Complaint) that the Bank, through its agents and employees, represented to Young that the Bank would release its mortgages on the 56 Patten Street and 227 Roxbury Street properties when the Debtor sold the 610 Columbus Avenue property.

30. Notwithstanding Young's credible testimony that she told Gauthier while the loan was being negotiated that the 227 Roxbury Street property "doesn't go" (Tr. 2:67), i.e., would not be pledged as collateral, the plaintiffs have not demonstrated by a preponderance of the evidence that Young did not intend or know that the Young Family Trust was giving the Bank a

mortgage on 227 Roxbury Street. Young signed a document authorizing Hilda Fleming, as Trustee of the Young Family Trust, to guaranty the note and to give the Bank a mortgage securing the guaranty. (Exhibit 21)

31. Stephen Kunian informed Millicent Young of, and discussed in advance with her, the structure and important details of the Trust, the Bank agreement, and the mortgages, guarantees, and other documents that she (both individually and as Trustee) and the Young Family Trust executed at the closing. (Tr. 7:88–89) The evidence does not support plaintiffs' allegations that Kunian knew about the kickback scheme before the closing and that by representing both the Bank and the Trust through the closing, he acted as an agent for the Bank in somehow subverting the plaintiffs' interests.

32. At the closing, the 604 and 610 Columbus Avenue properties were transferred to the Trust. (Exhibits 16 and 17)

33. Also at the closing, the Bank disbursed loan proceeds totalling $1,246,-561.40. This sum included a payment to itself (Exhibit 68) of $46,600.00 for the commitment (or origination) fee ($45,000), appraisal fee ($1,400.00) and credit fee ($200) assessed against the Debtor under the agreement. See paragraph 27(b) above. (Exhibits 46, 64 [8], and 68) It also included a disbursement of $5,040.00 to itself as a tax escrow payment. (Exhibits 46, 64 and 69) The remaining $1,194,921.40 of disbursements, which are not subject to dispute, consisted principally if not exclusively of payments made to or on behalf of the sellers [9] of the 604–610 Columbus Avenue property and the restaurant; this remainder will hereafter be referred to as "the purchase price". (Exhibits 46, 65–67, 70–76)

34. Also at the closing, the Bank created (but did not immediately fund) a checking account (# 383–443–3, the "loan proceeds account") in the name of the 604

---

**8.** Exhibit 64 is a computer-generated journal, a record of how the Bank advanced and disbursed the proceeds of the loans.

**9.** The sellers were Bob the Chef, Inc., REO Bar Realty Trust, and Boston Condominium Co., Inc.

Columbus Avenue Realty Trust. The Bank would make all its subsequent advances of loan proceeds to the Trust by depositing the advanced funds in this account. A signature card authorizing the Bank "to recognize any of the signatures subscribed [on it] in the payment of funds or the transaction of any business for this account" was signed at the closing by Young, Benjamin and Barrows. (Exhibit A; Tr. 2:85–89); Tr. 7:103) Young was not aware until after this litigation commenced that Benjamin's signature was on the card. (Tr. 3:123)

35. The Trust also had other accounts at Capitol Bank, including one for the restaurant and another for rental income from the Columbus Avenue property. Carl Benjamin had authority and responsibility to deposit restaurant revenues into the restaurant account; and he had authority to make disbursements from that account.

Assumptions

36. The Trust's ability to complete the renovations and to pay-off the loan timely hinged on several assumptions that the Bank and members of the Trust understood or reasonably should have understood before the closing. First, the amounts allocated under the loan for the payment of soft costs and construction costs would not cover those costs completely and would have to be supplemented by the borrower's own funds. The Bank and Young and Benjamin understood this (Tr. 5:63–65), and simple arithmetic would have confirmed that understanding. For example, the agreement allocated $100,000 of the loan proceeds to pay soft costs, but the parties could easily have foreseen that soft costs would substantially exceed $100,000. Interest on $1,250,000 (approximately the amount disbursed at the closing) alone for six months at 12.5% per annum totals $78,125; and the origination, credit and appraisal fees totalled $46,600; so, even without attorney's fees, taxes, insurance, inspection fees, and interest on subsequent disbursements, soft costs would exceed $100,000.

37. A second assumption undergirding the success of the project was that the Trust would resell the restaurant for $500,000 or more shortly after purchasing it. The Bank, Young and Benjamin viewed sale of the restaurant as a source of funding for the condominium project. (Tr. 5:63–65; Exhibits 1 and 2)

38. A third assumption was that the Trust would succeed in renovating and reselling the units as condominiums within six months, when the note matured. The Bank understood that the Trust would have to sell units in order to repay the loan. (Tr. 5:63–65; Exhibits 1 and 2) The Court has no evidence as to how many units would have to have been sold and at what prices to pay off the loan.

39. A fourth assumption was that the Trust would to some extent be able to rely on trade credit to finance the renovations. As Gauthier testified, the Bank was aware that the Trust could and would rely on trade credit to help finance renovations that the Bank's loan could not cover. (Tr. 4:135)

Advances of Loan Proceeds

40. The Bank advanced the remaining proceeds of the loan ($253,438.60) into the Trust's loan proceeds account within forty-seven days of the closing in three large advances: $53,438.60 on March 3, 1986; $100,000.00 on March 6, 1986; and $100,000.00 on April 15, 1986. (Exhibit 54, pp. 1–3, and Exhibits 55, 64, 146, 147) The only other funds deposited into this account through September 30, 1986, consist of $15,000.00 deposited into the account on June 27, 1986; the Court has no evidence as to who made this deposit or where the funds came from. The Bank automatically withdrew and paid to itself this $15,000 on the day it was deposited as part of the June 27 interest and tax escrow withdrawal described below in paragraph 47.

41. Sidney Weiner personally directed Arthur Gauthier to make the advances into the Trust's account that were made on March 3 and 6 and April 15, 1986. Weiner ordered these advances without having received requests for them from Young and despite having been advised by Gauthier that not enough work had been done on the project to justify the advances. On one

occasion, when Young learned that Weiner had ordered an unrequested advance of $100,000.00, Young specifically instructed Gauthier *not* to advance money she had not requested. (Tr. 2:94–85) I find that Weiner directed the advances without first receiving a request from Young, without the benefit of an inspection, and without regard for whether the Debtor had done construction work to justify the advances. As Gauthier testified, Weiner reasoned that the Bank could afford to disregard the construction work and inspection requirements because it had enough collateral. (Tr. 5:22)

42. Gauthier testified that the loan proceeds were advanced without following the agreement's provisions regarding the conditions on which advances could be made (see ¶ 27(d) above)—especially the condition that advances be made only upon requests from the Trust—because the Bank and the Trust agreed to modify that portion of the agreement. (Tr. 5:15–19) I disbelieve Gauthier's testimony that the Bank and the Trust orally agreed to modify these provisions. There is no credible evidence in the record that the Debtor ever agreed, orally or in writing, to a modification of the portion of the agreement regarding the schedule and conditions on which advances would be made.

43. Contrary to the Bank's contention, the provision in the loan agreement that loan proceeds would be advanced only upon requests from the borrower (see paragraph 27(d) above) benefitted both the Bank *and* the Trust. It benefitted the Trust by preventing the accrual of interest on loan proceeds until those proceeds were needed. Interest began to accrue on loan proceeds only when the Bank advanced them into the loan proceeds account; thus it was to the Trust's advantage not to request an advance of proceeds until the Trust actually needed the proceeds. In addition, the provision benefitted the Trust by sparing the Trust the necessity of safeguarding the proceeds in the loan proceeds account.

44. Sidney Weiner knew when he ordered that proceeds be advanced into the Trust's account that Carl Benjamin intended to use the proceeds to make kickback payments to Weiner. Weiner funded the loan in order to obtain the kickback from Benjamin.

45. Weiner's ordering premature and unrequested advances of loan proceeds into the Trust's account benefitted both the Bank and Weiner himself. They benefitted the Bank by causing the Bank to begin earning interest on the advanced funds earlier than it would otherwise have begun to earn interest. And they benefitted Weiner by facilitating and funding the kickback payments to him.

46. The Trust had a right to possess and control loan proceeds advanced into the loan proceeds account. The Trust was paying interest to the Bank for the right to use the proceeds.

**Bank's Withdrawal of Proceeds for Soft Costs**

47. From the Trust's account, the Bank automatically withdrew and paid to itself four interest payments totalling $60,550.78: $13,293.85 on April 16, 1986; $15,486.10 on April 28, 1986; $15,624.99 on May 27, 1986; and $16,145.84 on June 27, 1986. The Bank also withdrew $1,260.00 on each of the four above dates (for a total of $5,040.00) as tax escrow payments. In addition, the bank automatically withdrew and paid to itself $21.75 (in three withdrawals of $7.25 on July 31, August 29 and September 30, 1986) for service charges and $53.01 on April 23, 1986 for reasons unknown to the Court. (Exhibits 64, 146–152)

48. In summary, from the loan proceeds and the $15,000 deposited into the Trust's account on June 27, 1986, the Bank withdrew a total of $117,305.54 for soft costs:

| | |
|---|---:|
| Closing Fees | $ 46,600.00 |
| Tax Escrow (at closing) | 5,040.00 |
| Interest | 60,550.78 |
| Tax Escrow (April 16, 1986 through June 27, 1986) | 5,040.00 |
| Service Charge | 21.75 |
| Withdrawal on April 23, 1986 | 53.01 |
| TOTAL | $117,305.54 |

When this total is reduced by the amount of the $15,000 deposit, it appears that the Bank applied loan proceeds of $102,305.54 to soft costs.

49. Appendix B is a summary of the Court's findings regarding the manner in which proceeds of the first loan were disbursed.

Disbursements by Benjamin and Young

50. Benjamin, Young, and Melvin Averett [10] wrote thirty-eight checks processed on the Trust's loan proceeds account totalling $212,518.87; but two checks (totalling $10,843.21) were "reversed," so the net amount of checks processed was $202,674.66. The last was processed on June 27, 1986, leaving only $120.15 in the account. After that date, there was no activity in the account other than the monthly automatic deduction of service charges, which left the account with a balance of $98.40 on September 30, 1986.

51. Appendix A sets forth the Court's findings regarding the activity in the Trust account. It identifies the deposits, the checks written and processed against the account, and the automatic withdrawals for interest, tax escrow, and service charges. It also identifies whose signature appears on each check (but these identifications should not be construed as findings that the signatures are authentic).

52. Three of the checks written against the account, totalling $26,081.42, were written in payment of soft costs related to the loan: the March 4 check to Campbell and Chambers Insurance Agency for $17,395.00; the March 30 check to Alpha Acceptance Corp. for $4,343.21; and the April 30 check to Alpha Acceptance Corp./Campbell and Chambers Insurance Agency for $4,343.21. Another three checks totalling $26,424.50 may have been written to pay soft costs associated with the loan: the March 4 check to Kunian for $12,000.00; the March 12 check to Kunian for $13,000; and the June 23 check to Alpha Acceptance Corp. for $1,424.50. But the Court has only inconclusive evidence of the purposes of these three checks and makes no conclusive finding as to whether they were or were not written for purposes related to the loan. In any case, no more than $52,-

505.92 in checks went toward the payment of soft costs.

53. Of the entire $1,500,000 loan proceeds, only $25,000 was used for construction work on the Columbus Avenue properties. The money was used to make repairs at 610 Columbus Avenue and in the restaurant. (The Columbus Avenue property consists of two buildings. The first, 604–608 Columbus Avenue, contains the restaurant on the ground level and apartments above it; the restaurant's address is 604 and the apartments' is 608. The second building, 610 Columbus Avenue, contains only apartments.) None was used for renovation at 608 Columbus Avenue; renovations did not begin there until October, 1986. (Tr. 3:34–37) The Court has no evidence identifying the checks that were used to pay for the $25,000.00 of work.

54. Young testified that she authorized the expenditure of only about $25,000 of the loan proceeds (all of which was spent on the construction work discussed in the previous paragraph). (Tr. 3:34–35) I find this testimony to be false. Her signature appears on fourteen checks, totalling $82,712.32, written against the account. She testified that she did not sign one of these checks, the March 12 check to Bob the Chef for $7,000, and I believe her testimony. I also find that the signatures on the other thirteen are authentic. Therefore, Young herself disbursed, and so must have authorized the disbursement of, loan proceeds totalling at least $75,712.32 ($82,712.32 − 7,000.00 = $75,712.32), which may or may not include the entire amount discussed in the previous paragraph. In addition, Young acknowledged that two checks written by Benjamin, the March 4 check to Campbell and Chambers Insurance Agency for $17,395.00 and the March 30 check to Alpha Acceptance Corporation for $4,343.21, were legitimate disbursements. (Tr. 3:70) And she also testified that another $10,000.00 disbursed by Benjamin on March 20 to Eagle Realty was later returned to her. What Young did with the returned money is not clear, but it is clear

10. Averett wrote only one of the thirty-eight checks, a not especially significant check to Wo-

odchuck's Building and Home Center for $186.38 on April 10, 1986.

that she controlled the disposition of this money. (Tr. 3:72–74) Therefore, Young authorized or controlled the disbursement of checks totalling at least $107,450.53 ($75,712.32 + 17,395.00 + 4,343.21 + 10,-000.00 = $107,450.53).

55. Since checks totalling no more than $52,505.92 were disbursed for soft costs, and only $25,000.00 was disbursed from the account for construction costs, all the remaining checks written against the account (including at least $29,944.61 authorized or controlled by Young [107,450.53 − (52,505.-92 + 25,000.00) = $29,944.61]) must have been written for purposes other than those for which the parties agreed they would be expended: construction costs and soft costs.

56. Benjamin disbursed at least $26,300 from the account to himself without Young's authorization or knowledge. To accomplish this, he wrote and cashed two checks to "Cash" and one to himself: the April 11 check to Cash for $4,000.00; the April 16 check to Cash for $6,000.00; and the April 17 check to Carl Benjamin for $6,500.00. He also asked his friend Jack Finer to cash two checks for him. Benjamin wrote two checks to Finer, one on April 2 for $5,000.00 and another on April 25 for $4,800.00. Finer cashed these at Capitol Bank and returned the proceeds to Benjamin.

57. Benjamin also wrote seven other checks that Young neither authorized nor knew about:

(a) two checks to Rudolph Burrell, one for $1,100.00 on March 5 (Exhibit 134) and another for $5,500.20 on March 18 (Exhibit 139); the latter is endorsed only by Burrell, but the former bear's both Burrell's signature and the endorsement, "For Deposit Only, Bob the Chefs", in Benjamin's script;

(b) one check to Steven Kunian for $12,-000.00 on March 4, which Kunian endorsed and deposited into his firm's account;

(c) two checks to "Melvin Averett or Industrial Plumbing" one for $5,000.00 on March 10 (Exhibit 143) and another for $7,000.00 on an unspecified date in March (Exhibit 142), both of which are endorsed with Averett's signature; and

(d) two checks to Bob the Chef, one for $7,000.00 on March 12 (Exhibit 131) and another for $9,000.00 on March 21 (Exhibit 137); both are endorsed "For Deposit Only, Bob the Chef," and were deposited into the Bob the Chef account. The Court has no evidence about where these funds went after being deposited. The $7,000.00 check bears Young's signature, but Young did not sign or authorize the check.

58. I find by a preponderance of the evidence that Benjamin's check to Kunian and his $5,500.20 check to Burrell, though unauthorized, were not part of a scheme by Benjamin to launder money. The payees on those checks appear to have retained the monies for their own benefit. As to the remaining five checks described in the previous paragraph, the Court has insufficient evidence to find that the checks either were or were not part of such a scheme; each may have been, but the evidence does not support a finding one way or the other.

59. The checks described in paragraphs 56 and 57 above are the only ones written by Benjamin that the Court finds Young did not authorize.

Kickback Payments

60. At least three or four times between the end of February and the end of April, 1986, Carl Benjamin drove to the parking lot of a restaurant in Revere or Lynn and there gave an envelope containing cash to Richard Jaffe. Benjamin understood and the Court finds that these transfers were payments for the approval of the loan obtained by the 604 Columbus Avenue Realty Trust from Capitol Bank, and that they were bound for Sidney Weiner. (Jaffe's role was only that of a conduit.) The payments were made in manilla envelopes of approximately eight inches by ten inches; the envelopes had printing on them saying "Ebony Development" or "Ebony Construction Company". Jack Finer accompanied Benjamin on three or four of these trips and Melvin Averett accompanied Benjamin on at least one.

61. The Court has no evidence as to how much money was in any one of the transferred envelopes. Carl Benjamin stated that a total of $75,000 was paid to get the loan. (Tr. 3:24–25) His statement is credible, so the Court finds that the transfers to Jaffe totalled $75,000.

62. The funds transferred to Jaffe were taken in part from the Trust's loan proceeds account. The Court has no direct evidence tracing the transferred funds to the Trust's account, but the indirect and circumstantial evidence supports such a finding. The evidence shows that during the two months after the loan was funded, Benjamin took $26,300.00 in cash from the account—by writing and cashing checks to himself, to cash, and to Jack Finer (see ¶ 56 above)[11]; and during the same time period, Benjamin was also ferrying envelopes of cash to Jaffe in order to pay for the loan. The fact that Benjamin was taking cash out of the Trust account without authority at the same time as he was using cash to pay for the loan leads the Court to conclude that he was using the cash from the account to fund the payments.

This conclusion has further circumstantial support in that it helps explain why Benjamin was withdrawing cash from the Trust's account without Young's knowledge or permission: the payments he was making with the cash were part of a kickback agreement that was itself both illegal and unknown to Young. Although these payments involved substantial amounts of money, their illicit purpose required that they be made in cash and that they be kept from Young's knowledge.

63. The funds that Benjamin transferred to Jaffe included the proceeds of the checks that Finer cashed for Benjamin. (See ¶ 56 above.) Each time Finer cashed a check for Benjamin, Benjamin called the Bank in advance to get the check okayed. Benjamin instructed Finer to go to a front teller, who would cash the check for him without his having to produce identification. Both times, Finer was driven to Capitol Bank by Millicent Young's sister (whose name is not in evidence). When he got to the Bank, he would go to the front teller, sign the check, and hand it to the teller, who then would hand him money in a sealed envelope. Finer did not have to produce identification for the teller; and the teller said nothing to Finer. Finer then would bring the envelope back to Benjamin's office and give it to him.

64. It was improper, highly unusual, and inconsistent with Bank policy for a teller at Capitol Bank to cash a check without asking for identification. It would also be unusual and contrary to Bank policy for a teller to cash a check of $5,000 or more without first getting authorization from, and having the check initialed by, the head teller, the branch manager, or the loan officer in charge of the account. With respect to Finer's checks, I find that the authorizations were obtained in advance pursuant to Benjamin's calls to the Bank. The Bank did occasionally prepare cash in advance for certain of its clients. (Tr. 5:57) The Court has no direct evidence either identifying the person Benjamin spoke to at the Bank regarding Finer's checks or identifying the person at the Bank that authorized the check cashings. Gauthier testified and the Court finds that he neither received the calls from Benjamin nor instructed a teller to prepare cash in advance for Finer. By process of elimination, the instructions to prepare cash in advance for Finer must have come from the head teller, the branch manager, or Sidney Weiner, who acted as a loan officer with respect to this account.

Young's Response to Benjamin's Misappropriations

65. In April or May, 1986, Millicent Young learned from Frank Barrows that he had observed Jack Finer at Capitol Bank cashing a check written on the 604 Columbus Avenue Realty Trust account. Upon receiving this information, Young went to Capitol Bank and asked Arthur Gauthier to get her the cancelled checks from the

___

11. Benjamin may have taken more than $26,300.00 from the account to fund the kickback payments—see paragraphs 57 and 58 above— but the plaintiffs have carried their burden of proof with respect to only $26,300.00.

Trust's account, which he did. She examined the checks and found two that were made out to Finer. She had not seen these two before and knew nothing about them. Young then immediately instructed Gauthier, "no check goes out of here without my signature." Gauthier complied and changed the signature card for the account accordingly. He also asked Young why she was upset and whether she wanted to tell him anything. She said no and told him nothing.

66. Not long thereafter, Young had an argument with Benjamin at her office. Through either Barrows or Averett, she asked Benjamin to leave. Benjamin never returned to her office; she did not see him after that.

67. In May or June, 1986, Sidney Weiner called Young and said he understood she was upset. They met at a restaurant on Cambridge Street in Boston. There, Young told Weiner: "Carl [Benjamin] said $75,000 was paid to get the loan and he's writing checks out to pay money out and I don't know what's going on." Weiner responded: "Don't talk to Carl. He's a bum. Wait until Steve [Kunian] comes back and he'll take care of it." (Tr. 3:24–26) (Kunian was away on vacation at the time.)

68. Then, in the early part of June, 1986, Young told Stephen Kunian that Benjamin had written checks and taken money out of the account without her approval. She said she thought the money had been used to pay the Capitol Bank loan. And she told Kunian that she suspected Benjamin may have used the money to obtain the loan—that is, for a kickback. At this time, Kunian became aware that Young suspected that someone at the Bank was receiving a kickback for the loan, and that the kickback was being paid by Benjamin from the loan proceeds.[12]

69. Kunian did not contact any police or legal authority with respect to the information Young had given him. Nor did he speak to anyone at the Bank with respect to her allegations, at least not until the summer of 1987.

70. The Court has no evidence that the Bank instructed or influenced Kunian about how to advise the Trust with respect to her allegations about Benjamin's use of Trust assets to make kickback payments. Nor does the Court have evidence that in June, 1986, Young or the Trust would have chosen to pursue a different course of action against the Bank with respect to the kickbacks had they been represented by counsel that had no ties to Capitol Bank.

71. Between June and September, 1986, Kunian attempted unsuccessfully on behalf of the Trust to expel Carl Benjamin from the Trust and to get him to give up his beneficial interest in it.

The Refinancing

72. When the six-month term of the loan expired on August 27, 1986, and the note matured, renovations on the Columbus Avenue property had not begun. The Trust had not converted the property into condominiums, had not sold any condominiums, and had no money with which to pay the note. Therefore, Young and the Bank, through Arthur Gauthier, negotiated a second loan to refinance the first. The closing on the second loan occurred on September 12, 1986.

73. The second loan was secured and guaranteed by the same mortgages and guarantees as was the first. (Exhibits 38–45)

74. The agreement for the second loan, like the first, was evidenced by three documents—a note (Exhibit 34), a Loan and Security Agreement (Exhibit 35), and a Construction Loan Agreement (Exhibit 36) —which the Court will refer to collectively as "the second agreement." The second

---

**12.** The Court finds no evidence that Kunian had reason to know of the existence of a kickback agreement prior to this meeting with Young. Young and Barrows testified that as they were leaving the February 27 closing with Kunian and Benjamin, Benjamin told them that he had to pay Sid Weiner $75,000 for them to get the loan. Kunian denies this. The Court concludes that whatever Benjamin told them at that time, it was not sufficiently clear to alert any of them to forthcoming improprieties. Had it been sufficiently clear, Young and Barrows themselves would have done something to prevent Benjamin's misappropriation of Trust assets.

agreement resembled the first except in the following respects:

(a) Under the second agreement, the Bank would lend $1,750,000 to the Trust for a term of six months at the Bank's prime rate plus three percent, but not less than 12.5 percent;

(b) The Trust was required to pay to the Bank at the closing the sum of $52,700.00, consisting of an origination fee of $52,500.00 and a credit and application fee of $200.00;

(c) The parties agreed that the loan proceeds would be advanced for the following purposes:

(i) $1,500,000 at the closing "for acquisition of real estate and personal property" (Exhibit 35, addendum ¶ 11(a)), by which the parties meant, "to pay off the first mortgage," that being the primary purpose of the second loan;

(ii) $190,000 for construction costs at 604–610 Columbus Avenue; and

(iii) $60,000 for soft costs incurred with respect to the second loan.

75. At the September 12 closing, Young signed a letter authorizing Gauthier to disburse, and the Bank did disburse, proceeds of the second loan totalling $1,580,151.11 as follows: $52,700.00 to pay the Bank's origination and appraisal fees for the second loan (Exhibit 33); $1,524,516.11 to pay off the first loan, including $1,500,000 for the principal balance, $24,479.16 for the unpaid interest (at 12.5%) for the period from July 28, 1986, to September 12, 1986, and $36.95 to pay late charges (Exhibit 79); and $2,935.00 to Kunian's law firm for legal fees and costs related to the refinancing. (Exhibits 64, 109, and 56) Thus, on September 12, 1986, the Trust completely paid off the original loan and paid soft costs on the second loan totalling $55,635.00.

Sale, Readvance, and Extension

76. In January, 1987, the Trust abandoned its plans to renovate the 610 Columbus Avenue property and instead sold that property. The Bank executed a release of its mortgage (Exhibit 47) on 610 Columbus Avenue to allow the sale to go through; in exchange, proceeds of $692,400.00 from the sale were paid to the Bank to reduce the principal balance of the loan. (Tr. 5:91)

77. Later that January, the Bank's Executive Committee voted to readvance up to $45,000.00 to the Trust for construction at 604 Columbus Avenue.

78. On March 12, 1987, when the second loan came due and the Trust was still unable to repay the loan, the Bank and the Trust entered into an agreement to extend the second note. The Agreement to Extend Mortgage and Note (Exhibit 48) provided that in exchange for an extension fee of $11,026.00, the second note would be extended to the new maturity date of June 10, 1987. The interest provisions for the extension period remained the same as under the second note.

Advances and Disbursements Under Second Loan

79. During the term of the second loan and its extension, the Bank advanced loan proceeds totalling $1,795,000.00, consisting of the $1,750,000 advanced pursuant to the second agreement and $45,000.00 readvanced after the proceeds from the sale of 604 Columbus Avenue used to pay down the principal.

80. The balance remaining in the Bank's tax escrow account for the first loan, $6,284.45, was credited to the tax escrow account for the second loan on December 2, 1986.

81. Appendix C is a summary of the Court's findings (set forth in more detail in paragraphs 75, 78, 82–86, and 88) regarding the manner in which the proceeds of the second loan and of the readvance were disbursed.

82. During the term of the second loan and its extension, the Bank automatically withdrew and paid to itself interest payments totalling $98,047.01 as follows (Exhibit 64):

| | |
|---|---|
| 11/21/86 | $16,634.07 |
| 12/15/86 | 17,769.89 |
| 01/08/87 | 17,415.43 |
| 02/17/87 | 18,460.03 |
| 03/16/87 | 11,942.70 |
| 03/31/87 | 10,383.76 |

| | | |
|---|---|---|
| 05/12/87 | $ 5,441.13 [13] | |
| Total | $98,047.01 | |

83. Also, the Bank automatically withdrew and paid to itself three $200.00 appraisal fees (on 11/21/86, 1/23/87 and 2/17/87) totalling $600.00.

84. During the term of the second loan and its extension, the Bank transferred loan proceeds totalling $4,098.11 into the tax escrow account: $133.98 on March 17, 1987, and $3,964.13 on May 1, 1987. (Exhibits 64) The Bank entirely disbursed this total and the amount ($6,284.45) carried over into the tax escrow account from the first loan (see paragraph 73.1 above) to the City of Boston in payment of property taxes. (Exhibits 64, 84, 85, and 54, p. 9) Thus, the balance in the tax escrow account at all times after May 1, 1987, was zero.

85. In summary, during the term of the second loan and its extension, the Bank paid to itself proceeds from the second loan totalling $162,373.01, consisting of $52,700 for closing fees, $98,047.01 for interest, $600.00 for appraisal fees, and $11,026.00 for an extension fee. The Bank also applied loan proceeds of $2,935.00 in payment of attorney's fees and $4,098.11 in payment of taxes, bringing the total soft costs paid by the Bank out of the loan proceeds and the readvance to $169,406.12. This total exceeds the amount allocated under the second agreement for soft costs ($60,000.00) by $109,406.12.

86. Of the funds available for construction costs under the second note and the readvance, the Trust expended $95,000.00 for work on the renovation of 608 Columbus Avenue. In each instance, the Bank advanced proceeds to pay these costs only after the Trust did renovations on the property, Young asked Gauthier to make an advance, and Gauthier inspected the work to see that an advance was warranted. (Tr. 3:37–38)

Default on Second Note

87. When the extension period on the second note lapsed, the Trust was unable to repay the second note. Through Kunian, the Trust attempted to persuade the Bank to take a deed to the 604–608 Columbus Avenue property in lieu of all outstanding obligations of the Trust to the Bank. The Bank would not agree and, in September, 1987, began foreclosure proceedings. The Trust filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code (11 U.S.C.) on January 28, 1988, before the Bank could conduct a foreclosure sale. Millicent Young herself filed a petition for relief under Chapter 11 on December 11, 1987.

88. The Court has no evidence of the current amount of the Bank's claim against the Trust and no evidence that the Bank has filed a proof of claim in the Trust's bankruptcy case. The Bank filed motions in that case for dismissal and for relief from stay (to foreclose on 604–608 Columbus Avenue); both motions were denied. The Court has no evidence of the current value of the Bank's collateral.

Causes of Trust's Defaults

89. The use of Trust assets to make kickback payments was only one of several causes of the Trust's inability to repay the first and second notes when they matured. The causes included the following:

90. The Trust was unable to sell the restaurant. When it applied for the loan, the Trust depended on being able to sell the restaurant for $500,000 or $550,000 to help finance the purchase and renovation of the property; and at that time, the Trust believed it had a buyer. No sale ever went forward. This deprived the Trust of approximately $500,000 in cash resources. The Court has no useful evidence of the Trust's budget and cash needs for the Columbus Avenue renovations, so it is impossible to determine precisely the extent to

---

**13.** The March 31 interest payment of $10,383.76 and the extension fee of $11,026.00 were paid with the same treasurer's check (No. 201817), in the amount of $21,409.76. (Exhibits 82 and 64) Exhibit 64 indicates that the interest payment of May 12, 1987, totalled $11,618.12, but Exhibit 86 makes clear that only $5,441.13 of that total was paid with loan proceeds. The remainder, $6,176.99, was funded with a check written by Millicent Young on the Bob the Chef account.

which the Trust was relying on the missing $500,000 to complete the project. Nonetheless, the Court finds that at least a substantial portion of it would have been crucial to the success of the project even if all the loan proceeds had been applied to construction and soft costs as they should have been.

91. Another cause was the troubles the Trust began to experience with the six tenants occupying the apartments at 610 Columbus Avenue. In April, 1986, the tenants sued the Trust in the Housing Court department of the Massachusetts Trial Court on counts having to do with the habitability of the apartments and the Trust's attempts to evict them or raise their rents. Ultimately, in May, 1987, they obtained judgments against the Trust totalling $32,090.52; and more importantly, they successfully resisted (through January, 1987, when the Trust sold the property) the Trust's attempts to evict them and to gain possession of the property. These troubles generated legal expenses and a judgment debt and added to the Trust's cash flow problems. They also caused delays: the Trust could not commence the renovation or marketing of 610 Columbus Avenue while it was occupied.

92. Benjamin's kickback payments and other misappropriations of loan proceeds also contributed to the project's failure by depriving the Trust of needed cash. Benjamin made kickback payments totalling $75,000.00, at least $26,300 of which, and possibly as much as $60,000 of which, came from the loan proceeds. (See paragraphs 56–58 and 61–62 above.)

93. Another cause was the Trust's unexplained failure to use for renovations the portion of the loan proceeds it did have at its disposal. Not all the proceeds of the first note were used for Bank disbursements, soft costs, repair payments, and known misappropriations by Benjamin. After accounting for all of these, at least $64,366.94 of disbursements of proceeds (of the first loan) remain unexplained. See Appendix B. It is clear that these proceeds were not used on renovations. Approximately $30,000.00 of these were disbursed by Young herself (see paragraphs 54 and 55 above), who has not explained what these proceeds were used for and why they were not used for renovations.

94. The Bank's $109,406.12 overapplication of proceeds of the second loan to the soft costs of that loan (see paragraph 85 above) was another cause of the Trust's inability to repay the second loan, but not a major one. Had these proceeds been available for construction costs, the renovations on 608 Columbus Avenue would have proceeded further and the property would have increased in value. But in the absence of evidence on the Trust's renovation budget, the Court cannot find that these funds would have allowed the Trust to complete the renovations, sell the units, and pay-off the loan. Moreover, had the Bank not applied these proceeds to soft costs, the Trust's debt to the Bank would have been that much larger.

95. The Trust's inability to sell the restaurant was by far the single most important reason for the Trust's inability to renovate and market the Columbus Avenue properties and to repay the first and second notes. Benjamin's misappropriations, including the kickback payments, did not help matters; however, even had he not misappropriated loan proceeds, the Trust would not have been able to fund the renovations. The project could not succeed without the significant infusion of funds that sale of the restaurant was expected to provide.

Weiner and His Authority within the Bank

96. Weiner's involvement with the Trust's loan was unusual in several respects. First, he became involved with the loan at the negotiation stage, before it was approved. Second, during the negotiations, he dealt with the borrower through Richard Jaffe, who was not a Bank employee, instead of through the loan officer in charge of the Trust's loan, Arthur Gauthier. Third, he did not become involved with this loan because the loan officer in charge of it had brought a problem to him; Gauthier had not brought a problem to him. Fourth, Weiner was concerned and in-

volved with some of the day-to-day administrative aspects of the loan, such as the advancement of loan proceeds. Fifth, in advancing loan proceeds, he disregarded the conditions governing advances of construction proceeds in the first loan agreement. And sixth, he himself met directly with the borrower's Trustee, Millicent Young, more than once. (Tr. 4:91)

97. Sidney Weiner ran his own financial consulting business, known as Carroll Associates. Weiner and Pamela Larson, his secretary and bookkeeper, were its only employees; Larson began working for Carroll Associates in early 1986. From then until the spring of 1987, Carroll Associates did business out of the Revere branch of Capitol Bank. When Weiner and Larson were there, which totalled approximately twenty hours per week, they used the office of the branch manager, Ben Curtis, and displaced him to a teller's desk. The Bank's president, Sherwood Tarlow, knew that Carroll Associates was using the Revere branch; Tarlow telephoned Weiner frequently there. Carroll Associates did not compensate the Bank for the use of its space, telephone, and office equipment. No other director of Capitol Bank operated his or her own personal business out of the Bank's offices.

98. During the time he spent at the Revere branch, Weiner would meet privately with people, including occasionally Carl Benjamin and Richard Jaffe. Weiner also spoke with Benjamin on the telephone several times.

99. The president of Capitol Bank, Sherwood Tarlow, and Sidney Weiner spoke with each other by telephone several times each day. And when Tarlow was away on vacation, Weiner would use Tarlow's office at the main branch (Bulfinch Place) of Capitol Bank.

100. Ben Curtis regarded Sidney Weiner as his boss. Because Weiner was a director of the Bank, and because most people at the main office of Capitol Bank (including Sherwood Tarlow) were aware

that Weiner was working in the Revere office, Curtis assumed that Weiner had authority to be there.

101. Gerald O'Connell was the vice president in charge of administrative services at Capitol Bank. His responsibilities included space planning and security. In 1986 and 1987, he did not know that Carroll Associates was operating a business from the Revere branch of Capitol Bank. He did know, because Ben Curtis told him, that Sidney Weiner was using the Revere Branch to meet with "bad people" who frightened Curtis and whose business with Weiner, Curtis suspected, was not entirely legitimate. Curtis pleaded with O'Connell to do something about his predicament, but O'Connell did nothing because, though he felt something should have been done, he thought he could accomplish nothing. As O'Connell explained, had he told "someone upstairs" about Weiner's use of the Revere branch for these meetings, nothing would have been done about it. Weiner would have been permitted to continue using Curtis's office.

102. Weiner resigned from the Bank's Board of Directors and its Executive Committee in May or early June, 1987, when the Committee was informed that Weiner probably would be indicted for crimes including loansharking. The Board immediately asked Weiner to resign and he complied voluntarily. The Board conducted no investigation of whether the matters for which Weiner was indicted involved the Bank in any way.

103. On June 10, 1987, shortly after Weiner was indicted, Millicent Young told Arthur Gauthier for the first time that Carl Benjamin had taken monies from the loan proceeds and restaurant accounts and turned them over to Jaffe or Weiner.

*Conclusions of Law*

1. *Choice of Law:* To the extent that the claims in this proceedings are governed by state law, the law of the Commonwealth of Massachusetts governs.[14]

---

**14.** The parties do not contend otherwise and have framed their arguments in terms of Massachusetts law. Young resides in Boston; the

Bank has its principal place of business in Boston and is chartered under the laws of the Commonwealth of Massachusetts; the real

2. *Jurisdiction:* The claims brought in this adversary proceeding by plaintiffs Millicent Young and the 604 Columbus Avenue Realty Trust, both of whom are debtors-in-possession under Chapter 11 of the Bankruptcy Code, and by the Young Family Trust [15] are core proceedings within the meaning of 28 U.S.C. § 157(b)(2). The claims are counterclaims by the bankruptcy estates of Young and the Columbus Avenue Realty Trust, § 157(b)(2)(C); determinations of the validity, extent, or priority of liens, § 157(b)(2)(K); and proceedings affecting the adjustment of the debtor-creditor relationship, § 157(b)(2)(O). The Bankruptcy Court has jurisdiction under 28 U.S.C. § 157(b)(1) to hear and determine these claims.

3. *Conversion*

In their complaint, the plaintiffs allege rather generally that the Bank converted monies belonging to the Trust and held in the Trust's loan proceeds account. In their proposed conclusions of law, the plaintiffs narrow their allegations. They request the conclusion that the converted monies include $75,000.00 to $80,000.00 that was paid to Sidney Weiner and an unspecified amount of other monies that should have been used for construction costs on 608 Columbus Avenue but which instead were withdrawn by Capitol Bank and paid to itself for soft costs.

 Conversion is the exercise of dominion or control over personalty, including money, to which the plaintiff has an immediate right of possession. *Schmid v. National Bank of Greece, S.A.*, 622 F.Supp. 704, 713 (D.Mass.1985) (applying Massachusetts law); *Third National Bank of Hampden County v. Continental Insurance Company*, 388 Mass. 240, 244, 446 N.E.2d 380 (1983). No demand and refusal are necessary where the wrongful claim of

dominion or control is manifested openly or is self-evident from the nature of the act asserting control. *Lawyers Mortgage Investment Corp. of Boston v. Paramount Laundries, Inc.*, 287 Mass. 357, 360–361, 191 N.E. 398 (1934). Damages include the value of the personalty at the time of conversion, interest thereon from the date of conversion, and attorney's fees. *Id.* at 361, 191 N.E. 398; *Welch v. Kosasky*, 24 Mass. App.Ct. 402, 406–407, 509 N.E.2d 919 (1987).

(a) *Use of Proceeds for Soft Costs*

In their first agreement, the parties agreed that only $100,000.00 of loan proceeds were to be applied in payment of soft costs; but during the term of the first note, the Bank itself applied loan proceeds totalling $102,305.54 in payment of soft costs: $46,600.00 for closing fees, $45,-550.78 for interest, $10,080.00 for taxes, and $74.76 in other charges. (See Appendix B.) In their second agreement, the parties agreed to apply only $60,000.00 of the loan proceeds to soft costs; but the Bank exceeded that amount substantially by applying proceeds of $169,406.12 to soft costs: $52,700.00 for closing fees, $98,-047.01 for interest, $4,098.11 for taxes, $11,026.00 for the extension fee, $600.00 for appraisal fees, and $2,935.00 for attorney's fees. (See Appendix C.)

 The Bank paid these overages, $2,305.54 on the first note and $109,406.12 on the second, out of the Trust's loan proceeds, monies for the use of which the Trust was paying interest and other fees. The Trust had an immediate right of possession to those funds; and the Bank's misappropriations were inconsistent with the Trust's right to apply those proceeds to construction costs.[16] Therefore, the Bank's

---

property at stake in this proceeding is located in Massachusetts; and all the events at issue occurred in Massachusetts.

**15.** The Young Family Trust has not filed a petition in bankruptcy, but since Young, who is a Chapter 11 debtor, is its sole beneficiary and has full legal control over it and its assets (the Young Family Trust is a nominee trust), the

Young Family Trust's claims should be deemed core proceedings in Young's bankruptcy case.

**16.** The first and second agreements provided that any cash deposits in the Bank's possession and credited by the Bank to the Trust could be applied or set-off by the Bank against the Trust's liabilities under the agreements at any time (see Findings of Fact, ¶ 27(g); Exhibit 34, page 2; Exhibit 35, § 6.01); but the rights conferred by

payments of loan proceeds for soft costs in excess of the contractually agreed upon limits were wrongful exercises of control over the Trust's money. The Trust is entitled to damages for such acts of conversion in the amount of the monies converted, $111,711.66, plus interest thereon at the contract rate [17] from the dates on which the excess payments were made, plus attorney's fees.

(b) *Use of Trust Assets for Kickback Payments*

The second part of the plaintiffs' conversion count is the allegation that the Bank is responsible under the theory of *respondeat superior* for Weiner's and Benjamin's conversion of the funds used to make the kickback payments to Weiner. This allegation requires a two-part finding.

■ First, the Court finds that Weiner and Benjamin are liable to the Trust for converting the $26,300.00 [18] of loan proceeds used to fund the kickback to Weiner. Weiner and Benjamin cooperated in an effort to use proceeds of the first loan to fund kickback payments to Weiner. Weiner ordered that funds be advanced into the Trust's loan proceeds account with the knowledge and intention that Benjamin would use the funds, as he did and as he and Weiner had agreed that he would do, to fund kickbacks to Weiner. Benjamin's unauthorized withdrawals of loan proceeds and payments of proceeds as kickbacks were wrongful acts of dominion and control over the Trust's assets. Therefore, Benjamin is liable for conversion. And Weiner, by agreeing with Benjamin to approve the loan in exchange for a kickback from the proceeds, by knowingly and intentionally assisting Benjamin in converting the loan proceeds, by advancing the proceeds without Young's knowledge or consent, and by receiving the converted proceeds is likewise liable for conversion. *Nelson v. Nason,* 343 Mass. 220, 222, 177 N.E.2d 887 (1961) (" 'For harm resulting to a third person from the tortious conduct of another, a person is liable if he ... (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other.' Restatement: Torts, § 876.").

■ Second, the Court concludes that Weiner's liability for conversion is attributable to the Bank under the theory of *respondeat superior.* The principle of *respondeat superior* applies to banks as well as it does to other corporations. *McCarthy v. Brockton National Bank,* 314 Mass. 318, 50 N.E.2d 196 (1943). Banks can be held vicariously liable for the tortious conduct of their employees when (1) the conduct is of the kind the employee is employed to perform; (2) it occurs substantially within authorized time and space limits; and (3) it is motivated, at least in part, by a purpose to serve the employer. *Wang Laboratories, Inc. v. Business Incentives, Inc.,* 398 Mass. 854, 859, 501 N.E.2d 1163 (1986). Weiner's conduct satisfies these three conditions. His duties as a member of the Executive Committee included deciding whether loans should be approved and on what terms; and his wide-ranging duties as a consultant included negotiating loan agreements and ordering the advancement of loan proceeds. His acts occurred substantially within the flexible time and space limits in which the Bank permitted him to conduct its business. And his conduct was motivated in part by a purpose to serve the Bank: by approving the loan, and

these provisions were limited by the more specific provisions in each agreement limiting the amount of loan proceeds that could be applied to soft costs.

17. The contract rate is appropriate here (and on the other counts herein on which interest is awarded) because the Bank charged interest at the contract rate for the misappropriated proceeds. Some of the interest charged has been paid, and the remainder is part of the Bank's secured claims against the plaintiffs.

18. See Findings of Fact, paragraphs 56 and 62 above. The Court has found that Benjamin made kickback payments to Weiner totalling $75,000.00. (Findings of Fact, ¶ 61). Nonetheless, the evidence submitted does not permit the Court to find that more than $26,300.00 of the $75,000.00 paid to Weiner was taken from the Trust or its loan proceeds account. (Findings of Fact, paragraphs 56, 59, and 62)

**372**

by advancing loan proceeds to fund kick-backs, Weiner was not only helping himself but was also helping the Bank earn interest and other substantial fees, all with little risk because, as Weiner believed, the Bank was well secured. "The fact that the predominant motive of the agent is to benefit himself does not prevent the act from coming within the scope of employment as long as the act is otherwise within the purview of his authority." *Id.*, pp. 859–860, 501 N.E.2d 1163.

■ The Bank asserts an ultra vires defense[19], arguing that a bank cannot be held liable for damages caused by the unauthorized and illegal acts of its officers. The Court rejects this defense.

> The fact that an agent's act may be criminal does not by itself prevent it from falling within the scope of employment, particularly if the agent is "actuated by the principal's business purposes 'to any appreciable extent.'"

*Hunt v. Weatherbee*, 626 F.Supp. 1097, 1103 (D.Mass.1986), citing *Local 1814, Int'l Longshoremen's Ass'n v. National Labor Relations Board*, 735 F.2d 1384, 1395 (D.C. Cir.1984) (quoting Restatement (Second) of Agency, § 228(1) at 504 (1957)). See also *Doody v. John Sexton and Co.*, 411 F.2d 1119, 1122 (1st Cir.1969) ("It is common experience for a principal to be held accountable in tort for unauthorized acts of an agent not too far removed from the scope of his authority, even though, strictly, they were not authorized.") and *Robichaud v. Athol Credit Union*, 352 Mass. 351, 355, 225 N.E.2d 347 (1967) (ultra vires not a defense to a suit against bank for

deceit). Weiner's conversion of loan proceeds benefitted both the Bank and himself. And especially where the Bank allowed Weiner to use its facilities for his personal business, where Weiner's authority within the Bank was nearly absolute, and where Weiner's ability to extract and facilitate kickback payments from the Trust depended so much on his authority and control within the Bank, the Court must reject the ultra vires defense. Whether or not they were legal, Weiner's actions in this instance were the Bank's.

The Court concludes that the Bank is liable to the 604 Columbus Avenue Realty Trust for Weiner's conversion of loan proceeds totalling $26,300.00, damages for which include the amount converted, interest thereon at the contract rate from the date of conversion, and attorney's fees.

4. *Criminal Consideration:* The plaintiffs contend in Count III of their complaint that the first loan agreement between Capitol Bank and the Trust was illegal and should therefore be declared unenforceable. They argue that the loan was illegal because it was conditioned on the payment of illegal consideration: the kickback payments made from the Trust's loan proceeds.[20]

■ In Massachusetts, the illegality of one portion of an otherwise legal agreement does not necessarily render the entire agreement unenforceable. *Town Planning and Engineering Associates, Inc. v. Amesbury Specialty Co., Inc.*, 369 Mass. 737, 745–747, 342 N.E.2d 706 (1976). To determine how much of the contract should

**19.** The Bank asserts the ultra vires defense in its proposed conclusions of law but did not plead this defense in its answer to the second amended complaint. Ultra vires is an affirmative defense, *Robichaud v. Athol Credit Union*, 352 Mass. 351, 355, 225 N.E.2d 347 (1967), which a defendant must plead affirmatively. See Fed.R. Civ.P. 8(c), made applicable to this proceeding by Bankruptcy Rule 7008(a). Nonetheless, the Bank's failure to plead ultra vires affirmatively should not be deemed a waiver of that defense because the defense was tried with the implied consent of the parties. Fed.R.Civ.P. 15(b)); *Depositors Trust Co v. Slobusky*, 692 F.2d 205, 208 (1st Cir.1982). The plaintiffs and the Court have been on notice throughout these proceedings that the Bank was relying on the ultra vires defense.

**20.** The kickback agreement, which was made by Benjamin and not by the Trust, is therefore separate and distinct from the first loan agreement; but the illegality of the kickback agreement extends to the loan agreement because the two are closely connected: the promise and payment of the kickback were consideration for the loan, and the kickback was funded with loan proceeds. See *Zytka v. Dmochowski*, 302 Mass. 63, 65, 18 N.E.2d 332 (1938) ("The illegality of one contract does not extend to another contract unless the two are united either in consideration or promise.")

be declared unenforceable, courts must consider and evaluate all the circumstances:

> what was the nature of the subject matter of the contract; what was the extent of the illegal behavior; was that behavior a material or only an incidental part of the performance of the contract (were "the characteristics which gave the plaintiff's act its value to the defendant ... the same as those which made it a violation ... of law"); what was the strength of the public policy underlying the prohibition; how far would effectuation of the policy be defeated by denial of an added sanction; how serious or deserved would be the forfeiture suffered by the plaintiff, how gross or undeserved the defendant's windfall.

*Id.* 369 Mass. at 745–746, 342 N.E.2d 706. The Supreme Judicial Court warns against indulging "the sentimental fallacy of piling on sanctions unthinkingly once an illegality is found." *Id.* at 746, 342 N.E.2d 706. " 'Courts do not go out of their way ... to impose hardship upon the parties beyond that which is necessary to uphold the policy of the law.' " *Id.*, quoting from *Nussenbaum v. Chambers & Chambers, Inc.*, 322 Mass. 419, 422, 77 N.E.2d 780 (1948).

 The first loan agreement between the Trust and the Bank involved two illegalities: Weiner's request and acceptance of a kickback in exchange for his endeavoring to obtain the loan for the Trust; and theft or embezzlement—Weiner's and Benjamin's theft of Trust assets to fund the kickback payments. The former is a violation of several state and federal statutes prohibiting kickbacks for procuring loans: 18 U.S.C. §§ 215 and 656; G.L. c. 271, § 39. The purpose of each of these statutes is to protect the economic interests of banks (or in the case of G.L.C. 271, § 39, of employers) against certain of their officers and agents who might put their own interests ahead of the banks'. See *Exchange National Bank of Chicago v. Daniels*, 768 F.2d 140, 144 (7th Cir.1985); *United States v. Lane*, 464 F.2d 593, 595 (8th Cir.1972); and *United States v. Clark*, 765 F.2d 297 (2d Cir.1985). They are not intended to protect borrowers and those offering or

agreeing to make kickback payments. Therefore, the statutes would not be served by declaring the loan agreements (as opposed to the kickback agreement, which has already been executed) unenforceable; that would only exacerbate the harm the statutes were meant to prevent. Moreover, Weiner's violation of these statutes did not in itself wrong the Trust; had the kickback payment been paid with funds other than the Trust's, the Trust would have no complaint. I conclude that Weiner's request and acceptance of kickbacks in exchange for his permitting the loan to be approved does not in itself warrant declaring the remainder of the loan agreements unenforceable.

 The other illegality—the theft or embezzlement of loan proceeds to fund the kickback payments—did wrong the Trust, but the wrong committed does not render unenforceable the entire loan agreement. It is adequately redressed by the award of damages to be entered on the Trust's count for conversion of the assets used to fund the kickback. To declare the entire agreement unenforceable would be to award the Trust a windfall by penalizing the Bank in the full amount of the loan, an amount that is not only grossly disproportionate to the amount converted, but that also exceeds the fine prescribed by statute ("not more than $1,000,000.00") for accepting kickbacks. See 18 U.S.C. §§ 215(a) and 656. The Court concludes that in view of the judgment entered on the Trust's count for conversion of funds used to. pay the kickback, the loan agreement should not be declared unenforceable on the basis of illegality.

5. *Fraud and Deceit:* The plaintiffs' complaint includes one count for fraud and another for deceit (Counts I and II). Both contain the same allegations, which include four causes of action. First, they allege that Capitol Bank knowingly and intentionally represented to Millicent Young that the Bank would release its mortgages on her properties at 56 Patten Street and 227 Roxbury Street upon the sale of 610 Columbus Avenue. Second, they allege that Capitol Bank misrepresented and failed to

describe to Young the nature of the documents she executed on February 27, 1986. Third, they allege that Capitol Bank intentionally misrepresented to Young that all the documents she executed would later be destroyed if, when the plaintiffs finally had the opportunity to review them, they did not meet the plaintiff's approval. The Court finds that the plaintiffs have failed to prove these allegations by a preponderance of the evidence; therefore, judgment should enter on them for the Bank.

In their fourth cause of action for fraud and deceit, the plaintiffs allege that the Bank knowingly and intentionally misrepresented to the Trust the amount of consideration that the Trust would pay for the first loan. They allege that the Bank represented to the Trust that the consideration set forth in the commitment letter and first agreement was the sole consideration to be paid by the Debtor. However, the Bank had actual or constructive knowledge that Carl Benjamin, acting in concert with and as an agent for the Bank, would divert an additional $75,000.00 from the loan proceeds account and from the restaurant's revenues for use by the Bank, its agents, servants or employees. The plaintiffs further allege that the Bank then ratified these actions by taking no steps to address the alleged fraud after receiving actual knowledge of it, by entering into the refinancing agreement of September, 1986, by receiving an additional three percent commitment fee, and by applying the proceeds of the refinancing to pay the original note, all at a time when the Trust desperately needed funds to complete the renovations.

■ A cause of action for fraud or deceit requires proof that the defendant made "a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage." *Slaney v. Westwood Auto, Inc.,* 366 Mass. 688, 703, 322 N.E.2d 768 (1975). Liability for fraud or deceit

cannot be based on false statements of opinion, of conditions to exist in the future, or of matters promissory in nature, but can be based on a misrepresentation of present intent. *Yerid v. Mason,* 341 Mass. 527, 530, 170 N.E.2d 718 (1960); *Spencer Companies, Inc. v. Chase Manhattan Bank, N.A.,* 81 B.R. 194, 201–202 (D.Mass.1987). "Silence can constitute a misrepresentation where the defendant fails to disclose information that he is bound to reveal to the plaintiff." *Id.,* citing *Maxwell v. Ratcliffe,* 356 Mass. 560, 562, 254 N.E.2d 250 (1969), and Restatement (Second) of Torts, § 551 (1977). Moreover, a principal is liable for the fraud of its agent acting within the scope of his employment, even where the principal does not benefit from the fraud. *McCarthy v. Brockton National Bank,* 314 Mass. 318, 325–326, 50 N.E.2d 196 (1943); *Bockser v. Dorchester Mutual Fire Insurance Co.,* 327 Mass. 473, 477, 99 N.E.2d 640 (1951).

■ The Court finds by clear and convincing evidence that plaintiffs' allegations in support of this cause of action are true. The Bank, acting under Weiner's supervision with respect to the Trust loan, represented to the Trust that the consideration for the first loan was limited to the consideration itemized in the commitment letter and loan agreement documents. Weiner knew that Benjamin had agreed to pay additional consideration to him in the form of kickback payments to be funded with Trust assets; Weiner's knowledge of this fact is attributable to the Bank, especially because he acted as a consultant for the Bank with respect to the Trust loan. By entering into the loan agreement, the Trust reasonably relied on the Bank's representations about the extent of the consideration. The Trust was damaged by the Bank's misrepresentations, but only to the extent of $26,300.00, plus interest thereon at the contract rate.[21] The Court therefore rules that judgment should enter for the Trust on this cause of action in the amount of damages found above.

---

**21.** The Trust suffered no further damages from this misrepresentation, consequential or otherwise; the misrepresentation did not necessitate the refinancing, cause the failure of the Trust's renovation project, or necessitate the Trust's filing for protection under Chapter 11.

6. *Breach of Contract:* The plaintiffs set forth in Count IX of their complaint a general count for breach of the first and second loan agreements. Their proposed conclusions of law identify more specifically four ways in which the Bank allegedly breached the agreements.

■ (a) First, the Bank is alleged to have violated the February agreement by advancing all the construction funds despite Young's instructions not to do so, at a time when no construction had been done by the Debtor and when Benjamin was using the Trust's assets to pay kickbacks to Weiner. The Court finds that Weiner ordered that loan proceeds totalling $253,438.60, including the $200,000.00 that were to be used only for construction purposes, be advanced into the loan proceeds account; the Trust had not requested these advances, and in one instance, Young had instructed the Bank *not* to advance funds. Weiner ordered these advances knowing that no construction had been done to warrant them. In ordering the advances he knew that Benjamin intended to use some of the proceeds to fund the kickback payments. As a consequence of these improper advances, Benjamin misappropriated loan proceeds of at least $26,300.00 for kickback payments. In ordering the advances, Weiner was acting within the scope of his employment, for both his own benefit and the Bank's. I reject the Bank's argument that the provisions in the loan agreement governing the advancement of loan proceeds were solely for the Bank's benefit and that they could be waived by the Bank without the Trust's consent. The Court concludes that judgment should enter for the Trust on this cause of action in the amount of $26,300.00, plus interest at the contract rate.

■ (b) Second, the plaintiffs allege that the Bank violated the first loan agreement provision stating that only $100,000.00 of the loan proceeds would be applied to soft cost and that $200,000.00 would be used for construction funding. On this cause of action, judgment should enter for the plaintiff, but only in the amount of $2,305.54, plus interest at the contract rate. The Bank itself applied a total of $102,305.54 to soft costs, exceeding the agreed upon limit by only $2,305.54. The Trust itself expended additional monies on soft costs, but both parties understood that this would be necessary from the start. And since it was the Trust that expended these additional monies, the Bank cannot be responsible for the fact that some of the monies expended were taken from the loan proceeds account instead of from other sources.

■ (c) Third, the plaintiffs allege that the Bank violated the second agreement's provision that only $60,000 of loan proceeds would be reserved for soft costs. I find that the Bank did violate this provision by applying $169,406.12 of loan proceeds to soft costs, exceeding the agreed upon limit by $109,406.12 [22] (See Findings of Fact, ¶ 85) Judgment should enter for the Trust on this cause of action in the amount of $109,406.12 plus interest at the contract rate.

(d) Fourth, the plaintiffs allege that the Bank violated the February agreement by extracting $75,000 to $80,000 in additional consideration from the Trust to fund the kickback payments. As the Court found above on the conversion count, the Bank is liable under the theory of *respondeat superior* for Weiner's conversion of loan proceeds totalling $26,300.00 to fund kickbacks. Therefore, the Bank is also responsible in contract for misappropriating the Trust's loan proceeds. Judgment should enter for the Trust on this cause of action for $26,300.00 plus interest at the contract rate.

7. *Lender Liability:* The plaintiffs assert a count for "lender liability" in which they allege that the Bank entered into the second loan agreement with reason to believe that the Trust would not be able to meet its obligations thereunder; that it did so in order to force the Debtor to default on its obligations to the Bank; and that as a result, the Trust was unable to complete the renovation of 604–610 Columbus Ave-

22. See footnote 16 above, p. 370.

nue before the second note became payable. The evidence does not support these allegations. The Trust was already in default when it entered into the second loan agreement, which it did precisely to alleviate that default.

Moreover, the Trust was free not to enter the second agreement. The Trust's options were limited—refinance or face foreclosure proceedings—but it was the Bank's contractual prerogative to so limit the Trust's options. The plaintiffs knew this when they signed the first agreement and the related mortgage deeds and guarantees. Also, the plaintiffs knew or should have known the risks involved in the financing agreement, the risk of being unable to sell the restaurant and the risk involved in marketing the condominiums.

The Trust also alleges that the misappropriation of Trust assets to fund kickback payments should somehow be grounds for a lender liability judgment. The Court finds otherwise. The Court has already found the Bank liable for those misappropriations on conversion, fraud, and contract theories. The Court does not find that the misappropriations caused any greater damage to the plaintiffs than was assessed under those theories. The plaintiffs have adequate remedies under other theories, so there is no need for recourse to vague notions of "lender liability." Judgment should enter for the Bank on the lender liability count.

8. *Unjust Enrichment:* The plaintiffs assert a count for unjust enrichment in which they allege that the Bank has been unjustly enriched by the misappropriation of loan proceeds. The Court finds no basis for relief here. Recourse to the equitable remedy of unjust enrichment should be had only where there is no adequate remedy at law. *Taylor Woodrow Blitman Const. Corp. v. Southfield Gardens Co.,* 534 F.Supp. 340, 347 (D.Mass. 1982). Here the plaintiffs have adequate remedies at law for the Bank's misappropriations. Therefore, judgment should enter for the Bank on this count.

9. *Breach of Fiduciary Duty:* The plaintiffs allege in Count VIII of their complaint that the Bank had fiduciary obligations to the plaintiffs that it breached by recording the closing documents (from both closings) and by refinancing the first note. They argue that the plaintiffs were thus damaged by having granted mortgage deeds and by having become indebted for $1,750,000.

The court rejects this cause of action without addressing whether and to what extent the Bank had fiduciary obligations to the Trust. The Trust entered into both loan agreements, and the plaintiffs gave their guarantees and mortgages, in arm's length transactions on the basis of their own knowledge and evaluation of the risks involved. The Bank did act in bad faith in certain limited respects—by misappropriating loan proceeds for soft costs and kickback payments—but *for these wrongs,* the plaintiffs have adequate remedies in contract and in tort. The Court finds little evidence of a larger breach of faith, certainly not enough to warrant invalidating the loan agreements and the guarantees and mortgage deeds given to secure them. Judgment should enter for the Bank on this count.

10. *Equitable Subordination:* The plaintiffs also allege that the Bank engaged in inequitable conduct in connection with the first and second loan agreements and in receiving mortgage deeds on the Trust's property. More specifically, they allege that the Bank acquired its security interest as a result of a conspiracy to misappropriate monies belonging to the Trust, and that this inequitable conduct conferred an unfair advantage on Capitol Bank that justifies subordinating its secured claim to the claims of all unsecured creditors.

Under principles of equitable subordination, the Bankruptcy Court may subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim; or it may order that any lien securing such a subordinated claim be transferred to the estate. 11 U.S.C. § 510(c). The Court may exercise its equitable power to subordinate a claims only where (1) the claimant has engaged in some

type of inequitable conduct; (2) the misconduct has caused injury to creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim would not be inconsistent with the provisions of the Bankruptcy Code. *In re Giorgio*, 862 F.2d 933, 938–939 (1st Cir.1988); *Matter of Mobile Steel Co.*, 563 F.2d 692 (5th Cir.1977). The doctrine of equitable subordination permits the court to take account of the misconduct of one creditor towards another and of debts the creation of which was inequitable vis-a-vis other creditors. *In re Giorgio*, 862 F.2d at 938–939. Its focus is on inequity *among creditors.*

■ The Court finds that the Bank's commission of fraud, its breaches of contract, and its conversion of loan proceeds for the payment of Weiner's kickback and for the payment of soft costs are the kind of inequitable conduct for which the remedy of equitable subordination is appropriate. The Bank had actual control over the loan proceeds and through Sidney Weiner, exercised that control inequitably by using the proceeds to fund kickback payments. The Bank also exercised its control inequitably by paying itself soft costs greatly in excess of the contract limits. Moreover, the Bank's inequitable conduct caused injury to plaintiffs' creditors and conferred an unfair advantage on the Bank. The Bank's acts of conversion damaged other creditors by depleting the Trust's assets and, consequently, its bankruptcy estate; by substantially handicapping the renovation effort, on which many creditors ultimately had to rely for compensation[23]; by appropriating for the Bank's own benefit funds that the Debtor had bargained with the Bank to set aside for construction creditors; by causing interest to run on misappropriated proceeds, which interest and misappropriated proceeds are part of the Bank's secured debt and thus (in the absence of equitable subordination) will displace and take priority over the claims of the unsecured creditors; and by causing the Trust to incur legal fees, which, as administrative expenses of the Trust's bankruptcy estate,

will have priority over the claims of general unsecured creditors. These acts conferred an unfair advantage on the Bank by causing interest to accrue on loan proceeds of which the Trust had no control, and, with respect to the proceeds wrongly applied to soft costs, by the Bank's wrongful payment of those proceeds to itself.

■ Fraud and illegality together constitute one of three general categories of misconduct recognized by the courts as warranting equitable subordination. *Matter of Missionary Baptist Foundation of America*, 712 F.2d 206, 212 (5th Cir.1983); *In re Beverages International Ltd.*, 50 B.R. 273, 281 (Bankr.D.Mass.1985); *In re EMB Associates, Inc.*, 92 B.R. 9, 15 (Bankr. D.R.I.1988). Equitable subordination usually involves fiduciaries or insiders who have abused their status, but fraud and illegality constitute grounds for equitable subordination even where the creditor is not a fiduciary or insider or does not somehow control the debtor. *Id.* at 15; *Matter of CTS Truss, Inc.*, 868 F.2d 146, 148–149 (5th Cir.1989); *In re Martin Specialty Vehicles, Inc.*, 87 B.R. 752, 768 (Bankr.D. Mass.1988) ("One who is not an insider or in control may still have his debt subordinated if he is guilty of substantial misconduct involving moral turpitude or fraud, overreaching, or spoliation.") In cases where the creditor is not an insider, however, bankruptcy courts have usually subordinated the creditor's debt "on the ground that the conduct was egregious and severely unfair in relation to other creditors," *In re Giorgio*, 862 F.2d at 939; and the Debtor bears the burden of proving such conduct "with particularity." *In re EMB Associates, Inc.*, 92 B.R. at 15.

I need not decide whether the Bank was a fiduciary or insider because the Trust has proven convincingly and with particularity that the Bank's conduct in misappropriating loan proceeds was illegal, egregious and severely unfair to other creditors. This inequitable conduct resulted in injury to creditors and conferred an unfair advantage on the Bank. Therefore, and

---

**23.** See Findings of Fact, ¶ 39.

because equitably subordinating the Bank's claim would not be inconsistent with the provisions of the Bankruptcy Code, the Court concludes that the Bank's claim should be subordinated to the claims of the unsecured creditors, but only to the extent necessary to offset the harm that the Debtor and its creditors suffered on account of the inequitable conduct, as the doctrine of equitable subordination requires. *Matter of Mobile Steel Co.*, 563 F.2d at 701; *In re Martin Specialty Vehicles, Inc.*, 87 B.R. at 768. The harm suffered (the "total damages") in this case as a result of the Bank's inequitable conduct consists of the $26,300.00 used by Benjamin for kickback payments and the $111,711.66 applied by the Bank to soft costs, plus interest on these amounts at the contract rate from the dates on which they were misappropriated, and the attorney's fees reasonably expended in recovering these amounts.[24]

Accordingly, the Court rules that pursuant to 11 U.S.C. § 510(c)(1), Capitol Bank's claim against the Trust's bankruptcy estate should be subordinated to claims of priority and general unsecured claimants in an amount equal to the amount of the total damages.[25] And pursuant to 11 U.S.C. § 510(c)(2), the Bank's security interest in estate property, to the extent of value therein equal to the amount of total damages, should be transferred to the estate.[26]

### 11. *Invalidation of Loan and Mortgages:*

In addition to the relief requested above, the plaintiffs also seek orders invalidating entirely the Bank's mortgages on the plaintiffs' property and awarding the plaintiffs damages in the full principal amount of the second loan, $1,750,000. The Court rejects these requests as grossly disproportionate even to the substantial harm caused by the Bank.

### Conclusion

The Court concludes that judgment should enter for the Trust and against the Bank in the amount of $138,011.66,[27] plus interest thereon at the contract rate and attorney's fees. In addition, an order should enter subordinating Capitol Bank's claim to claims of priority and general unsecured claimants with respect to the amounts recovered by the estate on account of the above judgment for damages. And a further order should enter transferring to the Trust's bankruptcy estate the Bank's security interest in estate property to the extent of value therein equalling the amount of total damages. With respect to all other relief requested, judgment should enter for the Bank. A separate judgment will enter accordingly.

### JUDGMENT

This adversary proceeding having come on for trial before the Court, the issues

---

**24.** The attorney's fees include amounts reasonably expended in this proceeding and on related litigation against the Bank (such as the Trust's opposition to the Bank's motion for relief from stay and the Bank's motion to dismiss) in the Trust's bankruptcy case. Neither the attorney's fees nor the interest can be quantified at this time, not only because of lack of evidence as to attorney's fees, but also because neither interest nor attorney's fees have stopped accruing.

**25.** In other words, the Bank should not share in the distribution of the monies recovered by the estate in this proceeding; rather the total damages should be distributed to priority and general unsecured claimants in the manner that they would be distributed if the Bank had no claim against the estate. But all other assets of the estate, including the Bank's collateral, to the extent that its value exceeds the total damages, should be distributed as they normally would under the Bankruptcy Code and other applica-

ble law; the Bank may participate in the distribution of those assets.

**26.** This transfer is in lieu of the payment of damages; therefore, if the value of the Bank's security interest in estate property is less than the amount of total damages, the Bank must pay the estate the balance of damages.

**27.** In summary, the Court has found that the Trust is entitled to damages in the following amounts: $138,011.66 for conversion (consisting of $26,300.00 used for the kickback and $111,711.66 for soft costs); $26,300.00 for fraud and deceit (consisting of the $26,300.00 used for the kickback); and $138,011.66 for breach of contract (consisting of $26,300.00 used for the kickback and $111,711.66 used for soft costs). The Trust is entitled to only one recovery per injury, even where it has obtained judgment for an injury under more than one theory. Therefore, damages total only $138,011.66.

having been duly tried, and a decision having been duly rendered (see the Findings of Fact and Conclusion of Law issued today),

It is hereby *Ordered* and *Adjudged* that the plaintiff 604 Columbus Avenue Realty Trust recover of the defendant Capitol Bank and Trust Company the sum of $138,011.66 and interest thereon at the contract rate from the dates of the defendant's misappropriations [1], and reasonable attorney's fees [2];

And it is further Ordered, Adjudged, and Declared that the claim of the defendant against the bankruptcy estate of plaintiff 604 Columbus Avenue Realty Trust is subordinated to the claims of priority and general unsecured claimants therein with respect to the amount recovered by the estate on account of the above judgment for damages, interest, and attorney's fees;

And it is further Ordered, Adjudged, and Declared that the defendant's security interest in property of the bankruptcy estate of 604 Columbus Avenue Realty Trust be and is transferred to that bankruptcy estate to the extent of value therein equalling the sum of the damages, interest, and attorney's fees awarded above.[3]

1. The exact dates of the misappropriations cannot be determined. Therefore, the misappropriations made during the term of the first note—$2,305.54 for soft costs and $26,300 for kickback payments—will be deemed to have been made on the maturity date of the first note: August 27, 1986. And the misappropriations made during the term of the second note and its extension—$109,406.12 for soft costs—will be deemed to have been made on the maturity date of the second note as extended: June 10, 1987.

2. The court will issue a separate order establishing a procedure for determining the amounts of interest and attorney's fees due under this judgment and for determining the amount of Capitol Bank's claims against the bankruptcy estates of 604 Columbus Avenue Realty Trust and Millicent Young.

3. This transfer is in lieu of the payment of damages; therefore, if the value of the Bank's security interest in estate property is less than the sum of the damages, interest, and attorney's fees awarded above, the Bank must pay the estate the balance of damages.

| Date | Check No. | Payee/Depositor | Signed by | Debit | Credit | Balance |
|---|---|---|---|---|---|---|
| 3/3 | | (Advance from Loan Proceeds) | CB | | $ 53,438.60 | $ 53,438.60 |
| 3/4 | A-101 | Campbell & Chambers Insurance | CB | $17,395.00 | | 36,043.60 |
| 3/4 | A-102 | Stephen Kunian, Attorney | CB | 12,000.00 | | 24,043.60 |
| 3/5 | A-103 | Rudolph Burrell | CB | 1,100.00 | | 22,943.60 |
| 3/6 | | (Advance from Loan Proceeds) | | | 100,000.00 | 122,943.60 |
| 3/10 | A-104 | Melvin Averett or Industrial Plumbing & Heating | CB | 5,000.00 | | 117,943.60 |
| 3/10 | A-105 | Devon Lumber Company | MY | 1,244.61 | | 116,698.99 |
| 3/10 | A-106 | Countryside Mobile Home Park | CB | 5,000.00 | | 111,698.99 |
| 3/11 | A-107 | Contractor's Association of Boston | CB | 4,757.55 | | 106,941.44 |
| 3/12 | A-108 | Bob the Chef's | MY | 7,000.00 | | 99,941.44 |
| 3/12 | A-109 | Stephen Kunian | MY | 13,000.00 | | 86,941.44 |
| 3/? | A-110 | Melvin Averett or Industrial Plumbing | CB | 7,000.00 | | 79,941.44 |
| 3/17 | ------- | Ebony Construction Company | MY | 2,000.00 | | 77,941.44 |
| 3/18 | ------- | Rudolph Burrell | CB | 5,500.20 | | 72,441.24 |
| 3/18 | ------- | North Country Financial Services | MY | 1,000.00 | | 71,441.24 |
| 3/20 | ------- | Eagle Realty | CB | 10,000.00 | | 61,441.24 |
| 3/21 | ------- | Bob the Chef's | CB | 9,000.00 | | 52,441.24 |
| 3/25 | ------- | Ebony Development Corp. | CB | 3,680.00 | | 48,761.24 |
| 3/28 | ------- | Ebony Construction Company | MY | 1,000.00 | | 47,761.24 |
| 3/28 | ------- | Joseph Lepore | MY | 5,000.00 | | 42,761.24 |
| 3/30 | ------- | Alpha Acceptance Corp. | CB | 4,343.21 | | 38,418.03 |
| 3/31 | ------- | Robert Holland | CB | 6,500.00 | | 31,918.03 |
| 4/2 | ------- | Jack Finer | CB | 5,000.00 | | 26,918.03 |
| 4/3 | | Check Reversal | | | 6,500.00 | 33,418.03 |
| 4/4 | 1001 | Frank Barrows or Industrial Plumbing | MY | 5,000.00 | | 28,418.03 |
| 4/7 | ------- | Progressive Consumer Mortgage Services | CB | 200.00 | | 28,218.03 |
| 4/7 | Unknown | Unknown | Unknown | 6,500.00 | | 21,718.03 |
| 4/10 | 1002 | Woodchuck's Building & Home Center | MA | 186.38 | | 21,531.65 |
| 4/11 | 1003 | Cash | CB | 4,000.00 | | 17,531.65 |
| 4/15 | | (Advance from Loan Proceeds) | | | 100,000.00 | 117,531.65 |
| 4/16 | | Bank's Interest Withdrawal | | 13,293.85 | | 104,237.80 |

Appendix A

Page 2 of 2

Account Activity

| Date | Check No. | Payee/Depositor | Signed by | Debit | Credit | Balance |
|---|---|---|---|---|---|---|
| 4/16 | | Bank's Tax Escrow Withdrawal | | 1,260.00 | | 102,977.80 |
| 4/16 | 1004 | Cash | CB | 6,000.00 | | 96,977.80 |
| 4/16 | 1005 | Boston Gas Company | CB | 1,000.00 | | 95,977.80 |
| 4/17 | 1006 | Millicent Young | MY | 6,000.00 | | 89,977.80 |
| 4/17 | 1007 | Carl Benjamin | CB | 6,500.00 | | 83,477.80 |
| 4/24 | 1008 | Melvin Averettor Industrial Plumbing | MY | 9,500.00 | | 73,977.80 |
| 4/24 | 1009 | Frank Barrows or Industrial Plumbing | CB | 9,500.00 | | 64,477.80 |
| 4/25 | 1011 | Jack Finer | CB | 4,800.00 | | 59,677.80 |
| 4/28 | 1012 | Frank Barrows or Industrial Plumbing | CB | 1,000.00 | | 58,667.80 |
| 4/28 | | Bank's Interest Withdrawal | | 15,486.10 | | 43,191.70 |
| 4/28 | | Bank's Tax Escrow Withdrawal | | 1,260.00 | | 41,931.70 |
| 4/? | 1013 | Millicent Young or P. Keddy | MY | 1,700.00 | | 40,231.70 |
| 4/30 | 1019 | Alpha Acceptance Corp. & Campbell & Chambers Insurance Agency | MY | 4,343.21 | | 35,888.49 |
| 5/2 | (?) | Unknown Payee | Unknown | 4,343.21 | | 31,545.28 |
| 5/5 | | (Check Reversal) | | | 4,343.21 | 35,888.49 |
| 5/5 | 1015 | Zimmerman, Zaszkowski, Brenner & Kye | CB/MY | 15,000.00 | | 20,888.49 |
| 5/27 | | Bank's Interest Withdrawal | | 15,624.99 | | 5,263.50 |
| 5/27 | | Bank's Tax Escrow Withdrawal | | 1,260.00 | | 4,003.50 |
| 6/23 | ------ | Alpha Acceptance Corp. | MY | 1,424.50 | | 2,579.00 |
| 6/27 | | Deposit from Unknown Source | | | 15,000.00 | 17,579.00 |
| 6/27 | | Bank's Interest Withdrawal | | 16,145.84 | | 1,433.16 |
| 6/27 | | Bank's Tax Escrow Withdrawal | | 1,260.00 | | 173.16 |
| 7/23 | | (Purpose Unknown) Autocharge | | 53.01 | | 120.15 |
| 7/31 | | (Service Charge) | | 7.25 | | 112.90 |
| 8/29 | | (Service Charge) | | 7.25 | | 105.65 |
| 9/30 | | (Service Charge) | | 7.25 | | 98.40 |

## APPENDIX B
### Disbursement of Loan Proceeds (First Note)

Bank Disbursements (¶¶ 33,47,48):

| | |
|---|---:|
| Purchase Price | $1,194,921.40 |
| Closing Fees | 46,600.00 |
| Tax Escrow (Closing) | 5,040.00 |
| Interest (minus $15,000 deposit[1]) | 45,550.78 |
| Tax Escrow (4/16/86–6/27/86) | 5,040.00 |
| Service Charges | 21.75 |
| Withdrawal of 4/23/86 | 53.01 |
| Subtotal | $1,297,226.94 |

Trust Disbursements:

| | |
|---|---:|
| Construction Payments (Repairs) (¶ 53) | 25,000.00 |
| Soft Costs (Maximum) (¶ 52) | 52,505.92 |
| Kickback Payments (¶ 56) | 26,300.00 |
| Benjamin's Other Unauthorized Disbursements[2] (¶¶ 57,58) | 34,600.20 |
| Other (Unexplained) (¶ 93) | 64,366.94 |
| Total | $1,500,000.00 |

[1] The Bank withdrew and paid to itself, out of the loan proceeds account, interest payments totalling $60,550.78. See ¶ 47. However, only $45,550.78 of that total consisted of loan proceeds. The remaining $15,000 was funded with the $15,000 deposited into the loan proceeds account on June 27, 1986, from an unidentified source. See ¶ 40.

[2] Benjamin's other unauthorized disbursements (itemized in ¶ 57) totalled $46,600.20, but one of these disbursements—a $12,000.00 check to Steven Kunian dated March 4, 1986—is also counted among the soft costs disbursements. (See ¶ 52) In order to avoid double counting of the disbursement to Kunian, it is not being counted in this Appendix under the heading of "Benjamin's Other Unauthorized Disbursements."

## Appendix C
### Disbursement of Loan Proceeds (Second Note)

Bank Disbursements:

| | |
|---|---:|
| Payment of First Note (¶ 75) | $1,524,516.11 |
| Closing Fees (¶ 75) | 52,700.00 |
| Interest (¶ 75) | 98,047.01 |
| Tax Escrow (¶ 84) | 4,098.11 |
| Extension Fee (¶ 78) | 11,026.00 |
| Appraisal Fees (¶ 83) | 600.00 |
| Attorney's Fees (¶ 75) | 2,935.00 |
| Subtotal | $1,693,922.23 |
| Trust's Disbursements (Construction) (¶ 88) | 95,000.00 |
| Other (Unexplained) | 6,077.77 |
| Total | $1,795,000.00 |